[No. B068217. Second Dist., Div. Seven. Dec. 13, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY ANTHONY MAESTAS et al., Defendants and Appellants.

## COUNSEL

Steven Schorr, under appointment by the Court of Appeal, and Dale Metcalf for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Joseph P. Furman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—A jury convicted Gary Anthony Maestas (appellant) and Lynton Young (appellant) of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) causing great bodily injury. (§ 12022.7.) Appellant Maestas admitted a state-prison prior-conviction allegation (§ 667.5, subd. (b)) and the trial court found true[2] a serious-felony-conviction allegation. (§ 667, subd. (a).) Appellant Maestas was sentenced to state prison for 13 years and appellant Young for 6 years.

We find the trial court prejudicially abused its discretion (Evid. Code, § 352) in admitting gang membership evidence and reverse the judgments.

### INTRODUCTION

The events took place Friday night, September 27, 1991, outside a bar in Venice called the Brig Bar. The bar is about 45 by 25 feet and had 3 pool tables. It was dimly lit except above the pool tables. There were two doors: the front door, kept ajar, faced the street, and the side door, which adjoined the enclosed parking lot.

The victim, Jose Alex Andrade, had been playing pool in the bar when a man politely asked if he could speak to him outside. Once outside, the victim was confronted by a second man with a knife. The victim fled, returned, was again accosted by the two men and stabbed in the stomach. The victim identified appellant Maestas as the man who stabbed him and appellant Young as the man who invited him outside.

The defense was alibi. Appellant Young testified. Appellant Maestas did not testify[3] but did call alibi witnesses.

In summarizing the evidence we depart from our usual practice of distilling and making coherent dissonant testimony. Instead we provide a chronological, witness-by-witness summary designed to illuminate not only evidentiary strengths and weaknesses but the context of the gang membership evidence.

---

[1]Statutory references, unless otherwise noted, are to the Penal Code.

[2]The prior conviction allegations had been bifurcated and following the guilty verdict appellant Maestas waived a jury.

[3]He did testify at a section 402 hearing. (Evid. Code, § 402.)

## Factual Summary

*Detective James Ellis*

As a police detective with the Los Angeles Police Department, Detective Ellis was the assigned investigating officer. He visited the Brig Bar to take photographs of both the interior and exterior. The bar has a front and side door. Inside it is dark. There were at least two pool tables. Outside, near the front door, there was a street light.

*Doctor Henry Cryer*

Dr. Cryer is a surgeon and chief of trauma surgery at University of California, Los Angeles (UCLA) Medical Center. He was on duty September 28, 1991, when the victim, Mr. Andrade, was admitted at 12:45 a.m. The victim had a stab wound to his stomach and a laceration of his liver. The injuries were potentially life threatening. Another surgeon operated on the victim.

*Jose Alex Andrade[4]*

(Although Mr. Andrade understood most English and spoke some English, he testified through a Spanish interpreter.) On Friday, September 27, 1991, Mr. Andrade went to the Brig Bar. He arrived about 6:30 p.m. and started playing pool and drinking beer. He played pool with his brother George[5] who was already in the bar when he arrived. He also played pool with other people whose names he did not know. From 6:30 to 8 p.m. he had about four beers. He left the bar about 8 p.m. to see a friend, Kevin Manolatos.[6] He returned to the bar about 9 p.m. and resumed playing pool and drinking beer.[7] From 9 p.m. until he left the bar he had three or four more beers; he was not sure of the exact number. When asked if he felt intoxicated, he replied: "Not quite. Yes. With two or three beers, you already start to feel the effect. And, yes, with eight, I could have been slightly under the influence." Asked if "You were feeling high, in other words?" he answered, "Yes, but not stupid." He said he was not drunk.

---

[4]His testimony began before Doctor Cryer's testimony but ended after it.

[5]Among the testimony read back to the jury at their request was the victim's testimony concerning his brother George. George was not called as a witness.

[6]He also was not called as a witness.

[7]Mr. Andrade was not asked and did not testify whether or not his brother George was still at the Brig Bar when he returned.

Close to midnight, he was not sure of the time,[8] he began talking to a woman he had met in other bars. Her name was Sona Brara. She was sitting at the bar drinking Jack Daniels and Coke and he sat beside her. The bar was "packed." There were 80 to 100 people inside, and he could not tell if Sona was with anyone. He talked to Sona for about 10 minutes. She asked him for a ride home and he agreed.

Then appellant Young, in a very polite way, asked him "whether [he] had a minute and to please go outside with him." Appellant Young was alone. They walked out the front door and he saw appellant Maestas standing by the light post holding a knife. Appellant Maestas said he, Mr. Andrade, had been "talking to his 'ruca' inside the bar." "Ruca" means girlfriend or "old lady" in street slang. He was about two to three feet from appellant Young and about three to four feet from appellant Maestas. Appellants tried to hit him with their fists but Mr. Andrade ran away into an alley and around the block. They did not chase him.

Mr. Andrade returned to the side door of the bar and told the bouncer, Hugh Acosta, two people were trying to beat him up. The bouncer told him to go home.

Mr. Andrade walked through the parking lot toward his truck, parked across the street from the front entrance. He stepped off the curb, took about three steps, and was "attacked . . . from behind." Appellant Young hit him on the head and Mr. Andrade turned and "saw them." Appellant Young was on the left, appellant Maestas on the right. Appellant Young grabbed Mr. Andrade's arms "really hard" and appellant Maestas stabbed him in the stomach. Appellants hit him four or five more times, and Mr. Andrade fell down. Appellant Maestas swung at him several more times and cut Mr. Andrade's lip. They also kicked him. This all happened fast. Mr. Andrade remained on the ground briefly, then got up,[9] went to his truck, and started driving home.

At some point he saw a California Highway Patrol (CHP) vehicle, stopped, and asked the officer for assistance. The CHP officer called paramedics, who took Mr. Andrade to the UCLA hospital. He remained there six days.

Mr. Andrade did not remember how appellant Young was dressed that evening or if he had any identifying marks or scars. He did remember that appellant Young had a moustache and did not wear glasses or a hat. He told

[8]He later testified it was close to 11 p.m.
[9]Mr. Andrade was not asked and did not testify where appellants went.

the CHP officer that his assailants were both Mexican but he knew one was Mexican and the other mulatto.

Mr. Andrade remembered that appellant Maestas had a moustache that evening but could not recall if he had any scars or tattoos. He did not know what kind of clothing appellant Maestas wore but remembered that one of the men wore a hat. Mr. Andrade testified as follows concerning the hat: "It was a regular hat. It wasn't made out of cloth. It was made out of felt." "It was a cheap kind of hat. I couldn't define what brand or what kind it was." "It could have been white at one time, but it was discolored." When asked, "We're not talking about a baseball cap that has a visor, are we?," he answered, "Yes. That's exactly what we're talking about." Still later, when asked, "This baseball cap with the visor on it, did it have any kind of insignia like Dodgers or Angels or Brewers or anything on it?," he replied, "There is a misunderstanding here. We are not talking about a baseball cap. We are talking about a hat." "I never saw a baseball cap."

· After the attack, while in the hospital, Mr. Andrade described his assailants to his wife and to his friend Don Duvall.[10] With this description Mr. Duvall "put it all together" and told Mr. Andrade that the names of his assailants were Maestas and Young.

Thereafter Mr. Andrade was shown photographs without being told the names of the persons depicted. He identified appellants. Mr. Andrade identified appellants at the November 1991 preliminary hearing. He testified he was "positive" appellants had assaulted him.

*The prosecution rested.*

*Defense witnesses for appellant Maestas and appellant Young were interspersed.*

*John Schoeberl (called by appellant Young)*

Mr. Schoeberl was a mechanic and a student at the Los Angeles International Culinary Institute.

He had met appellant Maestas at Miguel Gayton's brother's house about a month or two before the stabbing. He had met appellant Young two or three weeks before the stabbing. Appellant Young was with appellant Maestas. He was a friend of appellants' but not a close friend. Appellant Maestas was a very good friend of Miguel Gayton and his brother.

---

[10]Among the testimony read back to the jury at their request was the victim's testimony concerning Don Duvall. Don Duvall was not called as a witness, nor was Mr. Andrade's wife.

On September 27, 1991, he went to the Brig Bar with appellants. They arrived between 8 and 9 p.m. He played pool but did not drink because he had a bad cold. He met Miguel Gayton[11] at the bar.

Appellant Maestas wore jeans, a dark tee shirt, and "a blue L.A. Dodger hat."

Appellant Young wore jeans and a T-shirt.

Appellants drank beer and shot pool.

He saw Mr. Andrade that night. He had seen him in the Brig Bar on prior occasions, and remembered that he was drinking V-8 juice and beer.

, He knew Sona Brara and saw her that night in the Brig Bar. She talked to just about every man in the bar. She talked to Mr. Schoeberl, appellant Maestas, and appellant Young. "We all talked to her as a group at one time." She also talked to Mr. Andrade. Sona was not appellant Maestas's girlfriend. Appellant Maestas was not trying to pick up Sona that evening. He told the defense investigator, Mr. Hart, that appellant Maestas did try to pick up Sona that evening.

Appellant Maestas left the Brig Bar about 10:30 p.m. with his wife, a tall blonde woman, 35 to 40 years old. He knew it was 10:30 p.m. because his friend Greg Dwyer[12] arrived and he gets off work at 10 p.m. and works in Gardena. Appellant Maestas did not return to the Brig Bar that night.

He saw Mr. Andrade leave the Brig Bar by the front door "close to 11:00 or 12:00" being "escorted out," he believed, by the bouncer.

Appellant Young left the Brig Bar about 12, approximately an hour after Mr. Andrade left.

He saw Sona arrive that night with a taller, stockier man wearing shorts. He had never seen that man before. Shortly before closing time, about 1:30 to 1:45 Sona and that man got into a loud argument. He was near them both. The man wanted Sona to leave with him and she did not want to.

Mr. Schoeberl testified he remained until closing time, 2 a.m.

He learned of the stabbing a week afterwards. About three weeks after that he found out appellants had been arrested. He did not contact the police.

[11]Miguel Gayton was not called as a witness.
[12]Greg Dwyer was not called as a witness.

During the summer before the stabbing he went to the Brig Bar two to three times a week and did not consider it a violent place although he had heard of fights occurring there "once a week or so."

*Detective James Ellis (called by appellant Maestas)*

Pursuant to a search warrant, on November 1, 1991, Detective Ellis searched appellant Maestas's residence for a knife but did not find one. At a later time appellant Maestas was arrested and searched but no knife was found.

*Hugh Acosta (called by appellant Maestas)*

Mr. Acosta had been the manager-bouncer of the Brig Bar for two years. He knew appellant Maestas, a regular customer who came to the bar two to three times a week. He had known appellant Young for about three years; he came to the bar about three times a week. Mr. Andrade came to the bar about five times a week.

His shift at the bar was 9 p.m. to 2 a.m. On Friday, September 27, 1991, he arrived at 8:50 p.m. and noticed several regular customers present, including appellant Maestas, Mr. Andrade, and Sona.

Appellant Maestas played pool. He is a very good player. Appellant Maestas wore jeans and a "cutoff sleeve sweat shirt . . . not quite short-sleeve, not quite long sleeves." When he saw appellant Maestas he was not wearing a hat.

He saw appellant Maestas leave that night between 10 and 10:30 p.m. Mr. Acosta was sure of the time because it was shortly after his wife telephoned between 9:45 and 10:15 p.m. She always called then so he could say good night to his young daughter.

Appellant Maestas left with a woman, his girlfriend or wife. She had arrived by car, parked by the front door, left a female passenger in the car, entered the bar, spoke briefly to appellant Maestas, and then left with him.

He saw Mr. Andrade that night drinking and playing pool. Later that evening, about 11:30 p.m., Mr. Andrade came running to the side door saying "somebody in here wants to kick my ass." Mr. Acosta asked him to identify or describe the persons but Mr. Andrade could not point them out. Mr. Andrade said they were wearing blue jeans and had baseball caps. Mr. Acosta told Mr. Andrade he should go home; he seemed intoxicated. Mr.

Acosta asked him how he had gotten there and Mr. Andrade pointed across the street to his truck. Mr. Acosta walked him "to the door a few feet" and said, "Have a good night."

He saw appellant Young drink that night but could not recall how he was dressed. Appellant Young did not leave the bar until about 1:30 a.m., shortly before "last call." He had been playing pool.

Although Sona "floated" around the bar she returned to "a gentleman and lady sitting with her." Mr. Acosta could not describe the gentleman because his back was to Mr. Acosta. Later in the evening, when Sona was still with the gentleman and lady, a former boyfriend of Sona's named Carlos had an argument with Sona.

Carlos is about 5 feet, 10 inches, 200 to 215 pounds. He had come to the bar earlier in the evening on a bicycle, left, and returned. Mr. Acosta told him he was "86'd" and could not enter the bar but somehow later, he snuck in.

Mr. Acosta, on September 27, was unaware that there had been a stabbing. He learned of it about a week later. Two weeks later he learned appellant Maestas had been arrested. He quit working at the Brig Bar because things were "getting a little bit too aggressive" for one bouncer and they would not hire another one.

*Linda Carrillo (called by appellant Maestas)*

Appellant Maestas was Ms. Carrillo's "common law husband." They had been together for 11 years and had 2 daughters.

Prior to September 27, 1991, she and appellant Maestas were having problems with their relationship. She was living on Palms Boulevard with her parents, her brothers, her two daughters and other relatives, while appellant Maestas lived with his mother on Westminister.

On September 27, 1991, she and appellant Maestas had agreed to meet and talk about their relationship. They were to meet at a friend's house, Yvonne's, at 9:30 p.m.

At 6 p.m. on September 27, 1991, Ms. Carrillo went to church with her friend Linda Pacheco in Ms. Pacheco's car. They left church at 10 p.m., arrived home about 10:15 p.m., stayed only a few minutes, and then Ms. Carrillo drove them in Ms. Pacheco's car to Yvonne's house. But she

mistakenly went to Yvonne's former residence so she detoured, and started toward Yvonne's house again, but as she was driving past the Brig Bar she saw appellant Maestas standing in the front doorway. She parked in front, left Ms. Pacheco in the car, walked inside, tapped appellant Maestas on the shoulder and said, "let's go." Appellant Maestas said he had just ordered a pitcher of beer but Ms. Carrillo said she did not care. They left.

They drove to the nearby Sunbay Motel where appellant Maestas rented a room. Ms. Pacheco left in her car but agreed to pick them up the next morning. Ms. Carrillo and appellant Maestas argued all night. He did not leave the room. Appellant Maestas was wearing Levi's, a Raiders T-shirt, and a blue Dodgers baseball cap.

The next morning Ms. Carrillo called Ms. Pacheco[13] and she picked up Ms. Carrillo and appellant Maestas.

Ms. Carrillo broke up with appellant Maestas on that September 27th but she still loved him.

Linda Carrillo had known appellant Young for about five years. Appellant Maestas had gone to appellant Young's house, she estimated, "more than ten times."

Linda Carrillo had been convicted of first degree robbery in 1977 and in 1984 pleaded guilty to a reduced charge of being under the influence of drugs.

*Appellant Young*

On September 27, 1991, appellant Young went to the Brig Bar with appellant Maestas and John Schoeberl. They arrived about 8 to 8:30 p.m. He played pool and drank beer and so did appellant Maestas. Appellant Maestas wore jeans and a short sleeve Raiders T-shirt, and had a blue baseball cap but he did not wear it inside the bar.

He saw Sona in the bar that night and saw her talk to lots of people but he did not talk to her and did not see appellant Maestas talk to her.

About 10 to 10:30 p.m. he saw appellant Maestas leave the bar with Linda Carrillo. Appellant Maestas said, "I'll be back in a little while," but he did not see him again that night.

He saw Sona arrive that night and she came in with Carlos Manzenelli and a girl.

---

[13]Linda Pacheco was not called as a witness.

Appellant Young testified he wore a T-shirt and blue sweat shorts. He saw Mr. Andrade, but did not talk to him, did not see him enter or leave, did not pay attention to him and did not attack him. He left the bar by himself about 12, 12:30, or maybe 1 a.m.

In answer to the prosecutor's questions he testified he was part Black and part Indian and had been mistaken for Hispanic. He had known appellant Maestas since 1987, frequently went to the Brig Bar with him, was "common law" married to his niece, their children played together, and during the month-long period from September 27, 1991, to November 1, 1991, he had been with appellant "ten, twenty times."

He and appellant Maestas both have tattoos on their arms.

Both appellants, at the direction of their attorneys, then rolled up their sleeves displaying to the jury their numerous tattoos. The prosecutor, without objection, had the record reflect that one of appellant Young's tattoos was "V-13." There was a stipulation that one of appellant Maestas's tattoos was "VENICE." Then, at a bench conference, the prosecutor stated she wanted to question appellant Young about his and appellant Maestas's affiliation with the Venice 13 Gang because the defense had now "opened the door" by the tattoo display. Before ruling, the trial court conducted a 402 hearing. (Evid. Code, § 402.) We defer our consideration of that hearing and the trial court's ruling to the DISCUSSION portion of our opinion.

*Kishor Patel (called by appellant Maestas)*

(Mr. Patel testified through a Hindi interpreter.)

Mr. Patel is the manager of the Sunbay Motel on Washington Boulevard in Venice.

On September 27, 1991, a Gary Maestas rented a room at the Sunbay Motel for two people. Mr. Maestas filled out the registration form, placed his driver's license number in the upper left corner, and signed the form (Defendant's exhibit A in Evidence). Mr. Patel did not remember the check-in time. It is motel policy to record the check-in date as the 27th if the registration occurs after 11 a.m. on the 27th and before 11 a.m. on the 28th.

*Hugh Acosta (called by appellant Young)*

Mr. Acosta saw Carlos Manzenelli in the Brig Bar that night talking to Sona. He watched Sona because lots of men always tried to pick her up and

that could cause trouble. Mr. Andrade was talking to Sona when Carlos said something to Mr. Andrade about "[n]ext time" and pointed at him. Then Carlos left the bar. This happened about 11:30, 11:15, or 11 p.m.

He thought appellant Maestas wore a sweat shirt that night.

(We defer consideration of Mr. Acosta's testimony concerning gangs to the DISCUSSION portion of our opinion.)

*The defense rested.*

## DISCUSSION

A. *The trial court abused its discretion (Evid. Code, § 352) in admitting gang membership evidence.*

It was the prosecutor's position that appellant Young had testified to two facts favorable to appellant Maestas: (1) appellant Maestas had not talked to Sona that evening, and (2) appellant Maestas had left the bar at 10:30 p.m. The prosecutor argued she was entitled to disprove these two facts by impeaching appellant Young. The impeachment was bias. The prosecutor contended appellant Young was biased in favor of appellant Maestas because both were members of the same organization, the Venice 13 Gang.

Before ruling, the trial court conducted a protracted hearing out of the presence of the jury. It then ruled the probative value of such gang membership evidence outweighed its prejudicial effect. (Evid. Code, § 352.[14]) For the following reasons the trial court was mistaken and in admitting the evidence abused its discretion. (Evid. Code, § 352.)

1. *The evidence of gang membership was weak.*

The only evidence of appellants' gang membership was the testimony of Los Angeles Police Officer Steven Alva, a stipulated gang expert assigned to the Venice 13 Gang for the past 18 months. In his opinion appellants were gang members because they lived in Venice and appellant Young had a "V-13" tattoo and appellant Maestas had a "VENICE" tattoo.

But Officer Alva also testified there were a dwindling number of Venice 13 Gang members, now only about 200 to 250, he had interviewed hundreds

---

[14]The section reads: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

of them, he maintained lists of gang members, and lists of gang member monikers (nicknames), and neither appellant Young nor appellant Maestas was on any list. Nor, in his conversation with gang members and their associates, had either of their names ever been mentioned.

Officer Alva further conceded he had no evidence appellant Maestas had ever been involved in gang-related crime, it was *"probable"* he was not an *active* gang member, and it was possible he was not a gang member at all.

Appellant Maestas testified at the hearing that he had never been a Venice 13 Gang member and got the "VENICE" tattoo about 20 years ago at the Long Beach Pike only because he lived in Venice.

No evidence disputed the age of appellant Maestas's "VENICE" tattoo.

2. *The evidence of gang membership was cumulative.*

■ Evidence of a "relationship" between a witness and a party is admissible to show bias. (3 Witkin, Cal. Evidence (3d ed. 1986) § 1921, p. 1875.) One such relationship is common membership in an organization: business, fraternal, national, etc. (*Ibid.*) But when other evidence has established such a "relationship" then common membership evidence is cumulative and, if prejudicial, inadmissible. (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 904 [184 Cal.Rptr. 165, 647 P.2d 569]; *People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1012-1013 [204 Cal.Rptr. 271].)

■ Here, other evidence established a close affinity, a personal relationship between appellants, far more compellingly than the "common membership" evidence. John Schoeberl testified appellants were close friends, had other common close friends (Miguel Gayton and his brother), and went to the Brig Bar together on September 27th. Linda Carrillo, appellant Maestas's common law wife, testified she had known appellant Young for five years and that appellant Maestas frequently went to appellant Young's house. Finally, appellant Young testified he and appellant Maestas had been friends since 1987, he was "common law married" to appellant Maestas's niece, their children played together, they frequently went to the Brig Bar together, and during a month-long period (Sept. 27, 1991 to Nov. 1, 1991) he had seen appellant Maestas "10, 20 times."

3. *Appellant Young's testimony concerning the two facts was cumulative, weak, and ultimately immaterial.*

The prosecutor claimed appellant Young testified that appellant Maestas did not talk to Sona that night. The prosecutor was mistaken.

Appellant Young testified that he had drunk beer by the pitcher that night, had "a nice buzz," played pool with lots of different people but always at the table closest to the front door, appellant Maestas "was around the bar," he did not pay attention to whether Sona talked to Mr. Andrade, had not noticed the commotion when about 10 customers ran to the side door with drinks and pool cues and were stopped by the bouncer, Mr. Acosta, and he "didn't *see* him [appellant Maestas] talking to [Sona]." (Italics added.)

Appellant Young *did* testify that appellant Maestas left the bar *about* "10:00, 10:30," but that testimony was cumulative and ultimately immaterial.

John Schoeberl testified appellant Maestas left the bar with his wife, Linda Carrillo, at 10:30 p.m., a time he was sure of because that was when his friend—who got off work in Gardena at 10 p.m.—arrived. Linda Carrillo's testimony was even more potent: she had a 9:30 p.m. appointment with appellant Maestas, went into the Brig Bar at 10:30 p.m., promptly took appellant Maestas out with her, and together they registered at the nearby Sunbay Motel. She named Linda Pacheco, a friend, who could corroborate her testimony. (The prosecutor did not call Ms. Pacheco as a witness.) The Sunbay Motel manager confirmed that on September 27, 1991, "a Gary Maestas rented a room for two people." Finally, Hugh Acosta, the manager-bouncer, testified he saw Linda Carrillo park by the front door, saw a woman passenger in the car, saw appellant Maestas leave with Linda Carrillo between 10 and 10:30, and was sure of the time because of the ritual 9:45 to 10:15 p.m. phone call from his wife and young daughter.

This unrefuted testimony by Mr. Schoeberl, Linda Carrillo, the motel manager, and Mr. Acosta that appellant Maestas had left the bar at about 10:30 p.m., well before the stabbing, was so overwhelming it ultimately forced a concession from the prosecutor, making appellant Young's testimony immaterial.

In her closing argument to the jury, the prosecutor stated: "First of all, it doesn't matter that Mr. Maestas—I'm sure he did leave before the stabbing. There is no doubt of that."

4. *It was in appellant Young's self-interest to testify appellant Maestas left at 10:30 p.m.*

The prosecution's case depended upon linkage: either both appellants were guilty or neither was. Appellants had arrived at the bar together, were close friends, gang members, and the victim had repeatedly identified both as his assailants.

But if appellants were not together at the time of the stabbing then there was no linkage. Appellant Young, in testifying he remained in the bar until 12:30 to 1 p.m. (over an hour after the stabbing) but appellant Maestas left at 10:30 p.m., had a motive for such testimony far stronger than "common membership," namely his own self-interest. That "bias, interest, or . . . motive" (Evid. Code, § 780, subd. (f)) has been termed "self-evident." (3A Wigmore, Evidence (Chadbourn rev. 1970) § 968, pp. 817-818, fn. 1.)

### 5. Gang membership evidence is inflammatory.

California courts have long recognized the potentially prejudicial effect of gang membership evidence. They have admitted such evidence when the very reason for the crime, usually murder, is gang related. "[I]n *People* v. *Manson* (1976) 61 Cal.App.3d 102, 131, 155-156 [132 Cal.Rptr. 265], it was proper to introduce evidence of the social structure, religion, and criminal activities of an organization known as the 'Family' because of its relevancy to the motivation and the nature of the conspiracy of the Tate-LaBianca murders. In *In re Darrell T.* (1979) 90 Cal.App.3d 325, 328-334 [153 Cal.Rptr. 261], the court discussed evidence concerning the history and nature of various juvenile gangs as it pertained to the proof of the existence of a motive relative to the crime of murder. In *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 194 [113 Cal.Rptr. 254], evidence concerning a membership in the Hell's Angels was deemed to be properly introduced relative to the issue of motive. In *People* v. *McDaniels* (1980) 107 Cal.App.3d 898, 904-905 [166 Cal.Rptr. 12], a companion case to *In re Darrell T.*, the Court of Appeal upheld the use of gang experts 'relating to the sociology and psychology of gangs.'" (*People* v. *Frausto* (1982) 135 Cal.App.3d 129, 141 [185 Cal.Rptr. 314] [Gang evidence properly admitted in drive-by shooting case where victims and defendants were members of rival gangs].)

But when gang membership evidence was admitted to only show bias, convictions have often been reversed. (*In re Wing Y.* (1977) 67 Cal.App.3d 69 [136 Cal.Rptr. 390] [A *court* trial].) Even when offered to buttress identification, the prejudicial effect may be too great. (*People* v. *Perez* (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619].) As the *Perez* court noted: "It is fair to say that when the word 'gang' is used in Los Angeles County, one does not have visions of the characters from the 'Our Little Gang' series. The word gang . . . connotes opprobrious implications . . . . [T]he word 'gang' takes on a sinister meaning when it is associated with activities." (*Id.* at p. 479.)

Our Supreme Court has observed that ". . . evidence of common gang membership . . . is arguably of limited probative value while creating a

significant danger of unnecessary prejudice" (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 450 [204 Cal.Rptr. 700, 683 P.2d 699] [Petition to sever two murder counts, linked only by evidence of common gang membership, granted]). Most recently, and even more strongly, it has stated: "When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact." (*People* v. *Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351]; see also *People* v. *Anderson* (1978) 20 Cal.3d 647, 650-651 [143 Cal.Rptr. 883, 574 P.2d 1235].)

### B. *The trial court error was prejudicial.*

We next consider whether the trial court's error was harmless or prejudicial. ■ Only if admission of the evidence "resulted in a miscarriage of justice" (Evid. Code, § 353, subd. (b)) may we reverse the judgments. We apply the *Watson* test: "[A] 'miscarriage of justice' [has occurred] when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ As we explain, the error was prejudicial because guilt evidence was weak while gang-violence-fear-retribution testimony and argument was pervasive.

### 1. *Evidence of guilt.*

In this "whodunnit" case, the prosecution had only the single victim to say "it was them," appellants.

Several factors detracted from the victim's identification. He admitted to having eight beers and being under the influence. It was dim in the bar. The contact outside the bar was "quick" and violent. The assailants were strangers to the victim.[15] The victim's description of the assailants was general and without details of height, weight, clothing (except contradictory "hat"— "cap" descriptions), age, or identifying marks. A friend (Don Duvall) told the victim the names of his assailants and afterwards, at the preliminary hearing (where defendants' names are publicly announced), the victim identified appellants.

---

[15]The victim did not remember if he had seen appellant Young in the bar before he asked the victim to step outside. The victim did not say he had ever seen appellants before that night. The victim did say he had seen appellant Maestas earlier that evening "at the corner of the bar."

Other factors diminished his credibility. During prosecution rebuttal, after being shown a photograph of Carlos, the victim testified Carlos was *not* one of his assailants but on cross-examination stated the first time he saw the Carlos photo was when the prosecutor had just showed it to him and that he had never personally seen Carlos. On awkward redirect examination, the victim testified the prosecutor *had* shown him the Carlos photo several days earlier and six months before the stabbing he thought he *had* seen Carlos at the boardwalk, just passing by. Even worse, the prosecutor called the victim to the stand a *third* time and had him repeat his confessions of testimonial inaccuracy, now characterizing them as "lies." Finally, inexplicably and unjustifiably, the prosecutor, in closing argument, repeatedly called the victim "stupid."[16]

The alibi defense, as we have discussed, was strong and unrebutted.

Additionally, the prosecutor had no coherent theory of guilt. She conceded appellant Maestas had left the bar an hour before the stabbing but did not say how—without a car—he had returned.[17]

### 2. *Gang-violence-fear-retribution testimony.*

Although the trial court had ruled that only gang *membership* evidence was admissible, and solely for the purpose of showing bias, the result of that ruling was testimony about gangs, violence, fear, and retribution.

Following that ruling, the prosecutor questioned appellant Young about fights occurring at the Brig Bar, gang members he knew, whether his "V-13" tattoo was visible when he wore short sleeve shirts, what he knew about Venice 13 Gang beliefs, and whether he noticed appellant Maestas's "VENICE" tattoo. Appellant Young testified he was 25 years old and had gotten his "V-13" tattoo when he was 13 years old.

In cross-examining Mr. Acosta, the manager-bouncer, the prosecutor asked if he had heard of a Venice 13 Gang, what their tattoos were like, whether appellant Maestas was a gang member, and whether as a result of his testimony he was "afraid of any retribution."

In rebuttal examination of John Schoeberl, the prosecutor asked if he had heard of the Venice 13 Gang, and whether he knew gang members.

---

[16]*If* a victim happens to be of below average intelligence it is reprehensible for a prosecutor to call him names, such as "stupid." In fact, our study of the record shows, the epithet was utterly uncalled for. Mr. Andrade, a carpenter, was a perceptive, thoughtful, and usually articulate witness. His occasional difficulty appears to have been caused by translation problems and prosecutor ill-preparedness.

[17]She appears not to have noticed appellant Young's testimony that appellant Maestas *said* he was going to return; at least she made no reference to it.

When the victim, Mr. Andrade, was called to the stand for the third time, the prosecutor asked, "Now, are you fearful for your safety because of your testimony here?" After the victim said "Yes," the prosecutor asked, "Is there something that has occurred on another night that has contributed to that fear?" An objection and bench conference followed. The prosecutor's offer of proof was: "Mr. Wells [a prosecutor] tells me that Mr. Andrade said that during the course of this case his car was trashed." When open court proceedings resumed, the prosecutor's first question was, "Mr. Andrade, when you testified today, did you have any fear of retribution because of the previous testimony that you've given?" Mr. Andrade said, "Yes." Later, when questioned by defense counsel about having lied, Mr. Andrade stated, "The reason was that I was intimidated when I was asked that kind of question, because there are some damages to my truck—," stopping only when the trial court interjected, "All right. You've answered the question, sir."

The prosecutor called a gang expert, Officer Alva. His testimony fills 47 reporter's transcript pages. His testimony ranged far from mere membership. He stated, "An active gang member is anybody that partakes *in any criminal activity* or other activity to advance the— . . . his gang's goals." (Italics added.) He said Venice 13 Gang members "have the belief that they are soldiers. They protect their territory, they protect their barrios, their neighborhoods . . ." He elaborated upon gang violence and the risk of displaying a gang tattoo: "There's a great possibility that some rival gang members may, instead of doing a drive-by, do what they call a walk-up, walk up and try to identify other gang members, and he could get stabbed or shot or severely beaten." He said his opinion that appellant Maestas had been a gang member was based not only on his "VENICE" tattoo and place of residence but also on "criminal activity." Officer Alva also testified that his specialized gang unit "target[s] gang members, and anything we can get them off the street for, we do, *because of the violent nature of the gangs—*" (Italics added.) The trial court denied a motion to strike this testimony.

The prosecutor recalled Detective Ellis, in rebuttal, and elicited that Mr. Acosta, the manager-bouncer of the Brig Bar, had told him he had problems with V-13 Gang members in the bar. "Specifically, there was one [that] he described as a V-13 gang banger named Danny Carrillo[18] who had threatened his life as well as his family's life. He told me he's taken guns and knives away from these people in the past." The trial court denied a motion to strike this testimony.

In jury argument, the prosecutor said that when the victim testified "he was afraid." Her next words were, "Now, the evidence of gang membership

---

[18]Appellant Maestas's common law wife was Linda *Carrillo*. She testified she had brothers who she was living with on September 27, 1991.

was—." She did not complete the sentence. She again stated "the victim is a very frightened and confused person today." The prosecutor represented that Mr. Schoeberl had testified appellants were gang members. There was no such testimony. Mr. Schoeberl's testimony that appellant Maestas "fits the stereotype" had been stricken by the trial court. Mr. Schoeberl testified he did not know if appellant Young was a gang member. The prosecutor emphasized Detective Ellis's testimony about gang threats to Mr. Acosta and his family. She said the victim "was afraid of retribution . . . . He's scared to death. He is scared to death that these two guys that stabbed him are going to go free." "He did say his car was damaged since he testified last," the prosecutor said.

We conclude that erroneously admitted gang membership evidence and its wake of gang-violence-fear-retribution testimony resulted in a miscarriage of justice. We have no need to address the other contentions of appellants.

### DISPOSITION

The judgments are reversed. The matter is remanded to the trial court for further proceedings.

Lillie, P. J., and Johnson, J., concurred.