Filed 8/26/13  P. v. Guzman CA4/3
Reposted to provide correct version

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046266 |
| v. | (Super. Ct. No. 07NF0659) |
| RAMON GUZMAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Daniel J. Didier, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed.

John Derrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Ramon Guzman was charged with one count each of first degree burglary, assault with a deadly weapon with an allegation he inflicted great bodily injury on the victim, and second degree robbery. A jury acquitted defendant of burglary, but found him guilty of the other charges and found the great bodily injury allegation to be true. The trial court sentenced defendant to concurrent three-year terms on each count and ordered him to pay Gustavo E. over $46,000 in restitution. Defendant contends the trial court committed reversible error by allowing the prosecution to cross-examine defense witnesses about their gang affiliations, admitting gang-related evidence, including that of a gang expert, and then instructing the jury on the use of the expert's testimony. He also attacks the restitution award on the ground the trial court failed to determine whether the amount of medical expenses claimed was the amount actually paid by the victim. We agree the trial court committed prejudicial error in overruling defendant's relevancy and Evidence Code section 352 objections to much of the gang-related evidence admitted in this case and on the use of the gang expert's testimony. Consequently, we need not determine the correctness of the court's restitution ruling.

FACTS

Gustavo E. and his family, which included his wife Alma and daughters Trysha and Kelly, lived on Gramercy Street. Rosalba R., defendant's ex-wife, lived on the same street with her children; Fatima R., Giovanny N., Jocelyn N., and Raymond G. Defendant, the father of Raymond, lived in Ontario but took the children for visitation on the weekends. (Due to the number of trial witnesses, many with the same last name, we will hereafter refer to each witness by his or her first name only. No disrespect is intended.)

On a Friday evening in December 2006, 14-year-old Kelly and 13-year-old Fatima got into a fight on the front lawn of the E. residence. Alma and Trysha

testified Fatima's friend, M.R., was also kicking Kelly during the altercation.

Gustavo and Alma separated the girls. Gustavo testified he grabbed Fatima by the wrist. She got up and ran away. Because of the extent of injuries suffered by his daughter, Gustavo telephoned the police about the incident.

Within minutes, a group of 15 to 20 people, mostly teenagers, congregated across the street from the E. residence. Trysha testified they were "[t]hrowing gang signs." She identified some of them by name, including Fatima, Rosalba, M.R., defendant, and Amos L.

Trysha and Alma went outside with a video camera and began recording the activity to document it for the police. According to Alma, defendant and Rosalba appeared at this time.

The crowd was swearing at them and shouting they were going to die. One person threw a beer bottle at the E. residence and the group began to move forward, causing Trysha and Alma to retreat toward their home.

Trysha testified some members of the crowd, including defendant, ran toward the house while Rosalba hit her mother. On direct examination, she claimed defendant and the others entered the residence and pulled her father into the middle of the street where the crowd began beating, kicking, and spitting on him. She saw Amos and others strike him with a metal pipe. Trysha tried to intervene between her mother and Rosalba, but Fatima pulled her away and began hitting her. Others, including defendant, then began hitting and kicking Trysha. Defendant took the camera from her, and the others kept beating her until they heard the police sirens.

Gustavo and Alma claimed Rosalba, defendant, and another man entered the E. residence. According to Gustavo, Rosalba punched him in the face, breaking his glasses. Defendant and the other man then shoved and dragged him out of the house into the street where defendant and others began kicking, beating, and spitting on him. Some teenagers struck Gustavo with small bats. Alma testified Giovanny struck her husband

3

with a broom. Gustavo identified defendant as the person who hit him with a metal object. He spent three days in the hospital due to his injuries.

The defense presented a very different picture of the events that evening. Fatima testified that when she was fighting Kelly, Alma suddenly appeared swearing at her and pulling her hair. Gustavo then struck Fatima on the back of the neck. Meanwhile, Alma slapped M.R. Fatima and M.R., along with Jocelyn, returned to the R. residence where Fatima told her mother that Gustavo had struck her.

The R. family members who testified at trial (Rosalba, Fatima, Giovanny, and Jocelyn), denied defendant was at the home when Fatima reported what occurred outside the E. residence. However, M.R. contradicted this claim, testifying she saw defendant upon their return to the R. home.

Rosalba testified she left home to find out what happened and encountered Gustavo in the middle of the street. He was speaking on a telephone. Rosalba asked him what happened and why he hit her daughter. He told Rosalba not to get involved and pushed her backwards with the phone. Rosalba responded by punching him in the face, causing his nose to bleed. She then began fighting with Alma. Fatima, who had accompanied her mother, began fighting with Trysha. The other R. family members corroborated this sequence of events.

Jocelyn testified she ran home to call the police, found defendant waiting in his car, and told him what happened. According to defendant, he went to the scene of the altercation, arriving just as Gustavo was about to hit Rosalba. He testified he rushed towards Gustavo, asking "'Why are you trying to hit my wife,'" and pushed Gustavo aside. (Italics omitted.) Gustavo fell down on the pavement. The crowd that had gathered then approached and began kicking and hitting him. Defendant claimed he helped Gustavo stand up and then broke up the fights between the mothers and the daughters.

4

The R. family returned home, but defendant left shortly thereafter. Rosalba and defendant denied entering the E. home and all of the R. family witnesses denied taking a video camera.

M.R. gave yet another version of the altercation. She testified defendant and Rosalba confronted the E.'s together and, when the two families met in the street, "everybody started fighting." She denied seeing a video camera.

Amos also testified for the defense. He admitted having a boyfriend-girlfriend relationship with Fatima when the altercation occurred. Amos went to Gramercy Street after hearing from a friend that his girlfriend had gotten into a fight. He corroborated M.R.'s testimony that defendant and Rosalba arrived at the scene of the altercation together. While acknowledging defendant fought with Gustavo, Amos claimed it was he who knocked Gustavo to the ground and struck him with a metal pipe. Amos denied seeing defendant enter the E. residence or a video camera.

Rosalba admitted she was later arrested for her participation in this incident and entered a guilty plea to a charge of felony assault. Giovanny, Fatima, M.R., and Amos also acknowledged they admitted the allegations of juvenile court petitions charging them with felony assault. Amos's plea included a grand theft charge. The admissions by Fatima, M.R., and Amos included an allegation they committed the crime for the benefit of, at the direction of, or in association with a criminal street gang.

The prosecution's cross-examination of Giovanny, Amos, Fatima, and M.R. included questions about their knowledge of and association with a gang named Chicanos Kicking Ass (CKA). They were asked about gang members' nicknames, what the gang's initials stood for, its membership, and whether they hung out with CKA members. Amos admitted belonging to CKA, but the other witnesses generally denied knowledge of the gang, belonging to it, or associating with its members.

On rebuttal, the prosecution called five police officers who took statements from witnesses after the altercation. The officers who interviewed Giovanny, Fatima,

5

and Rosalba testified all three had admitted defendant was present when Fatima initially reported being hit by Gustavo and that he accompanied Rosalba to the confrontation. An officer who questioned M.R. testified she admitted knowing three CKA members and to having a nickname. M.R. also told the officer that she and Fatima called several CKA members after their initial encounter with the E. family.

Detective Jeff Mundy was allowed to testify as an expert on criminal street gangs, including CKA. He stated the phrase "pattern of criminal gang activity" used in defining street gangs included "crimes . . . like assaults with deadly weapons . . . ." Mundy testified the term "'active participant'" included "someone who's hanging out with a gang and engaging in gang activity . . . ." He claimed gang members generally look out for each other, do not associate with people that are not connected to the gang, and do not cooperate with law enforcement. He interviewed Giovanny and Fatima, claiming each admitted knowing members of CKA and hanging out with them and that Fatima admitted belonging to CKA.

Mundy also questioned defendant. During the interview, defendant denied having pushed Gustavo because he thought Gustavo was about to hit Rosalba, and told Mundy that when he arrived Gustavo was already being beaten by several neighborhood gang members.

DISCUSSION

1. *Admission of Gang Evidence*

a. *Background*

Before trial, defense counsel sought a ruling on the prosecution's ability to present evidence on the gang affiliations of defense witnesses. Counsel argued this evidence was either irrelevant or subject to exclusion under Evidence Code section 352. The prosecutor claimed the evidence was relevant for several reasons, including to show

6

bias "because gang members don't cooperate with law enforcement." The trial court noted defense counsel's objections, but overruled them finding the evidence related to defense witnesses' gang affiliation relevant and its "probative value . . . not substantially outweighed by the negative factors under [Evidence Code section] 352."

Over objection, the court instructed the jury with a modified version of CALCRIM No. 303. It stated, "evidence of other acts, contacts and investigations, which in part served as the basis for Detective Mundy's opinions about CKA and its members and/or associates . . . [¶] . . . may be considered when you evaluate the basis for Detective Mundy's opinions about the gang and its members and/or associates," and that, "Detective Mundy's opinion as well as other evidence of gang affiliation may be considered by you only in judging the credibility of witnesses . . . ."

*b. Analysis*

On appeal, defendant repeats his claims the trial court erred in allowing the prosecution to cross-examine defense witnesses about their gang affiliations and by admitting expert testimony on criminal street gangs because this evidence was either irrelevant or too prejudicial. He further argues the court's modified version of CALCRIM No. 303 exacerbated the error. In response, the Attorney General argues the gang-related evidence was relevant "because it helped make the underlying events more understandable to the jury, and it constituted permissible impeachment for bias, which assisted the jury in its evaluation of witness credibility." We conclude defendant's claims have merit and require his convictions be reversed.

"California courts have long recognized the potentially prejudicial effect of gang membership. . . . 'The word gang . . . connotes opprobrious implications' [and] 'takes on a sinister meaning when it is associated with activities.' [Citation.] Given its highly inflammatory impact, the California Supreme Court has condemned the

7

introduction of such evidence if it is only *tangentially* relevant to the charged offenses. [Citation.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.)

In some circumstances, "evidence of gang membership is . . . relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.  [Citations.]"  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  But, "gang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.  [Citations.]'  [Citations.]"  (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.)

Here, much of the gang-related evidence was either irrelevant to the charges in this case or subject to exclusion under Evidence Code section 352.  Defendant was not charged with street terrorism.  The prosecution did not present any evidence that even remotely suggested he belonged to CKA or any other gang.  Defendant did not even live in the neighborhood.  Nor did the prosecution allege he committed the substantive crimes "for the benefit of, at the direction of, or in association with" CKA.  (Pen. Code, § 186.22, subd. (b).)  Before trial, the prosecutor suggested the gang-related evidence was relevant to show a conspiracy.  But no evidence of a conspiracy was presented and, while the court instructed on aiding and abetting liability, it did not instruct on conspiracy.

Cases where gang-related evidence has been held admissible without a substantive gang charge or street gang enhancement allegation involve defendants with gang ties that made the evidence relevant to a material issue.  (*People v. Lee* (2011) 51 Cal.4th 620, 643-644 [admission of the defendant's gang nickname "'Point Blank'" relevant to his identity, intent, proof of malice, and "manner in which he killed" victim]; *People v. Jordan* (2003) 108 Cal.App.4th 349, 365-366 [defendant's gang membership

8

admissible in drug sale prosecution where he claimed only gangs sold drugs in the area]; *People v. Ruiz* (1998) 62 Cal.App.4th 234, 240-241 [proof of common gang membership admissible where the defendant and another denied knowing each other].) That is not the case here. Defendant's purported association with gang members was equivocal at best. In addition to the absence of the facts cited above, Trysha testified that on the night of the assault defendant, Rosalba, Fatima, and M.R. stood separate from the group of teenagers outside her family's home, and the teenagers did not join the altercation until the confrontation moved into the street. Alma testified she saw defendant and Rosalba arrive at the E. residence when she and Trysha stepped outside to videotape the crowd that had previously gathered.

The Attorney General contends the gang evidence was relevant to impeach defense witnesses. The prosecutor did assert impeachment as a basis to admit the gang evidence at the pretrial hearing and the trial court instructed the jury that it could consider the evidence for this purpose. "Evidence of a 'relationship' between a witness and a party is admissible to show bias. [Citation.] One such relationship is common membership in an organization: business, fraternal, national, etc. [Citation.]" (*People v. Maestas* (1993) 20 Cal.App.4th 1482, 1495; see also *People v. Ruiz, supra,* 62 Cal.App.4th at p. 240.) Gang evidence is also relevant where it concern's a witness's credibility. (*People v. Ayala* (2000) 23 Cal.4th 225, 276-277.)

The reliance on witness credibility to justify the admission of gang-related evidence is largely unpersuasive. First, while the trial testimony showed several defense witnesses belonged to or associated with CKA, as noted, the prosecution presented nothing tying defendant to CKA or any other criminal street gang.

Second, potential bias on the part of the defense witnesses was established by other, obvious and less inflammatory means. "'[W]hen other evidence has established such a 'relationship' then common membership evidence is cumulative and, if prejudicial, inadmissible. [Citations.]'" (*People v. Ruiz, supra,* 62 Cal.App.4th at p.

9

240.)  The defense called six witnesses other than defendant.  Four of them had a familial relationship with defendant.  Rosalba, his ex-wife, testified the two of them "get along" and acknowledged defendant took her children for visits even though only Raymond was his child.  Giovanny and Jocelyn, while aware defendant was their stepfather, identified him as "my dad."  Fatima also acknowledged defendant was "like a dad to [her]."

The remaining two defense witnesses, M.R. and Amos, also acknowledged a relationship with the R. family that would support a conclusion they were biased towards defendant.  M.R., who was Fatima's friend, testified, "I would sleep over [at the R.] house after school and stuff," and was with Fatima when she fought with Kelly.  Amos acknowledged he and Fatima had a boyfriend-girlfriend relationship at the time of the altercation and he knew defendant.

Admittedly, the evidence tying M.R. and Amos to defendant was much weaker than for the other defense witnesses.  At trial, M.R. admitted she had not seen Fatima in several years and Amos also testified that he and Fatima terminated their relationship years earlier.  Further, defendant acknowledges Fatima, Giovanny, M.R., and Amos were properly impeached with their prior gang-related felony convictions.  This evidence established M.R. and Amos shared another nexus with Fatima and Giovanny and, coupled with other testimony concerning gang loyalties, showed an alternative basis for a potential bias by M.R. and Amos to slant their testimony in defendant's favor.

But even where gang evidence is relevant, "it may have an inflammatory impact on the jury" and the "'trial court[] should carefully scrutinize such evidence before admitting it.  [Citation.]'" (*People v. Avitia, supra,* 127 Cal.App.4th at p. 192.)  Here, the trial court failed to scrutinize the prosecution's other gang evidence much of which had nothing to do with supporting the theory M.R. and Amos had a motive to testify for defendant.  The prosecutor was allowed to cross-examine defendant on whether he knew the neighborhood teenagers who joined in the melee were gang members.  Similarly, the prosecutor questioned Fatima and M.R. on whether they knew

10

several of those teenagers were gang members, even though none of those teenagers testified at trial. Mundy was also allowed to name six purported CKA members he had investigated for participating in the fracas, five of whom were not trial witnesses. The prosecutor exploited the leeway he received from the court by having the expert testify that CKA was a criminal street gang that engaged in a pattern of criminal activity, which included "assaults with deadly weapons, murders, [and] auto theft." The expert described an active gang participant as someone engaging in gang activity and committing crimes, explaining that "an active participant in just another way of describing a member." A prosecutor could call the gang expert to identify the gang affiliation of those defense witnesses who denied their gang involvement, but much of Mundy's inflammatory testimony had little to do with impeachment.

Alternatively, the Attorney General argues the gang evidence was admissible "to make the events . . . more understandable to the jury." Cases have recognized gang evidence may be admissible if relevant "to explain an otherwise inexplicable attack." (*People v. Memory* (2010) 182 Cal.App.4th 835, 860; see also *People v. Beyea* (1974) 38 Cal.App.3d 176, 194-195, disapproved on another ground in *People v. Blacksher* (2011) 52 Cal.4th 769, 807-808.) Arguably, some evidence that defense witnesses belonged to or associated with a gang might be admissible to explain the sudden appearance of a large number of angry people outside the E. residence. There was testimony that after Fatima and Kelly fought, Fatima and M.R. contacted CKA members and reported what had happened. Trysha also testified members of the crowd displayed gang signs.

However, defendant's presence and his participation in the attack on Gustavo and the robbery are easily explained by his close relationship with Rosalba and her children, including Fatima. Absent proof tying defendant to CKA, merely showing others appeared and participated in the attack because of Fatima's and M.R.'s gang association is insufficient to support the extensive amount of gang evidence introduced in

11

this case. The prosecution was not only allowed to show Fatima and M.R. associated with CKA members and contacted some of them after the initial altercation with Kelly, but the court permitted Mundy to express opinions on certain characteristics of criminal street gangs, including his belief gang members only associate with other gang members. Thus, Mundy's testimony could have led the jury to improperly infer defendant was associated with CKA because of his presence outside the E. residence.

Thus, we conclude the gang-related evidence was largely irrelevant and, to the extent it had any relevance, the trial court erred in failing to limit the scope of it at trial. The remaining issue is whether the error caused prejudice to defendant. "The erroneous admission of gang or other evidence requires reversal only if it is reasonably probable that [an] appellant would have obtained a more favorable result had the evidence been excluded. [Citations.]" (*People v. Avitia, supra,* 127 Cal.App.4th at p. 194; see also *People v. Lee, supra,* 51 Cal.4th at p. 646.)

This case involved largely a credibility contest. The E. family members who testified at trial claimed defendant and others entered their residence and dragged Gustavo outside. There were, however, inconsistencies in their version of events. When cross-examining Gustavo, defense counsel introduced a transcript of his 911 call. At one point, the dispatcher asked him if he was inside his house. Gustavo responded "'I am outside.'" After the dispatcher told him to go inside, he said "'we're going inside.'" Although Gustavo testified defendant, Rosalba, and a third person dragged him out of the house, he purportedly told a police officer on the night of the attack he was brought out by "[a] group of teenage[rs]." Contrary to the testimony of her parents and her own testimony on direct examination, on cross-examination Trysha stated only defendant entered the home and dragged her father into the street.

The Attorney General notes the jury acquitted defendant on the burglary charge. But there was conflicting evidence on the remaining counts as well.

12

Concerning the assault charge, Gustavo claimed defendant struck him with the metal rod. However, Mundy admitted that neither Gustavo nor Alma could identify defendant when shown a photographic lineup with his picture in it. When the prosecutor asked Alma who used the metal rod, she responded, "all of them." On direct examination, Trysha identified Amos and two other teenagers as the persons hitting her father with the metal rod. On cross-examination she could not remember who had it.

On the robbery count, Mundy testified the police seized a video camera during a search of the R. residence. Only Trysha was able to identify it as the one belonging to her family. Rosalba testified the video camera seized by the police belonged to her. Through Rosalba, the defense introduced two photographs, taken in 2004 and 2005, purportedly depicting her holding the same video camera.

All of these conflicts in the testimony suggest the case was a close one on each count. "Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability. [Citations.]" (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.) Mundy's testimony was intended only to assist the jury in judging the credibility of witnesses, but he was allowed to state the phrase "pattern of criminal gang activity" included assault with a deadly weapon, one of the crimes defendant was charged with in this case, and that one "hanging out with a gang and engaging in gang activity" qualifies as an active participant in a gang. Further, during closing argument the prosecutor described defendant as the "ringleader" of the attack on Gustavo and referred to the other participants in the attack as "gang bangers" and "gangsters."

"'Legions of cases and other legal authorities have recognized the prejudicial effect of gang evidence upon jurors. [Citations.]' [Citation.] That prejudice not only affects the jurors' assessment of the defendants' credibility, but also taints their view of events with the inference of the defendants' criminal disposition." (*People v.*

13

*Memory, supra,* 182 Cal.App.4th at p. 862, fn. omitted.)  Under the circumstances, we conclude the trial court's erroneous ruling on the admissibility of much of the gang evidence along with its giving the modified jury instruction on the use of the gang expert's testimony created an unacceptable risk the jury concluded defendant must be a bad person because violent gang members, some of whom testified on defendant's behalf, helped him commit the felony assault and robbery.

DISPOSITION

The judgment is reversed.

RYLAARSDAM, ACTING P. J.

I CONCUR:

ARONSON, J.

14

BEDSWORTH, Dissenting:

I respectfully dissent.

This is a hard one for me to understand. My colleagues describe this case as a "credibility contest." Then they hold the trial judge erred in allowing evidence that was clearly material to credibility. And they not only hold it was error for the trial judge to allow the prosecution to introduce evidence pertaining to the credibility of the witnesses, they hold it was an abuse of discretion.

Abuse of discretion is serious terminology. It is often described as making an unreasonable decision (See, e.g., *People v. Gonzalez* (2012) 210 Cal.App.4th 724, 742), but because the word "unreasonable" has been diluted in common parlance, some courts have felt it necessary to elaborate on that description: "A trial court's decision whether to exclude evidence under Evidence Code 352[1] . . . is reviewed for abuse of discretion and will be upheld unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*People v. Williams* [(2008)] 43 Cal.4th [584,] 634-635.)" (*People v. Thomas* (2012) 53 Cal.4th 771, 809.) So when we talk about this judge abusing his discretion, we're saying his decision was so preposterous (Oxford American Writer's Thesaurus (1st ed. 2004) p. 974), second synonym for "unreasonable"; first synonym is "unacceptable") that no reasonable judge could have made it. We're talking about him temporarily taking leave of his reason, bowing to "caprice" (Webster's New World Dictionary of the American Language (2d ed. 1978) p. 211): "a sudden, impulsive change in the way one thinks or acts; freakish notion; whim"), and arriving at a decision that is "patently absurd."

I can't find that here. In fact, I'm hard-pressed to find any error, much less abuse of discretion.

---

1      All further statutory references are to the Evidence Code.

The majority roots its reversal in the admission of evidence that impeached *witnesses* with their gang affiliations. The word "witnesses" is italicized here because it is, for me, the key to the case. There was no evidence – not even a suggestion – that defendant was a gang member. No one even hinted he belonged to the gang. Everyone – prosecution witnesses, defense witnesses, prosecutor, defense counsel – agreed he was not a member of the gang.

So evidence admitted to show that the witnesses were gang members could not possibly redound to his prejudice. What it did was show a critical bias of the defense witnesses that should have made a difference to the jury in this "credibility contest." I find nothing capricious or absurd in that ruling.

Essentially, the witnesses in this case comprised two groups: 1) friends and family members of the victim; and 2) friends and family members of the defendant. The first group assigned culpable actions to the defendant, the second group absolved him of blame. As my colleagues acknowledge, the jury's task was to decide which group to believe.

To help them decide this question, the trial judge allowed the prosecution to show that of the six percipient witnesses called by the defense, four were gang members and two were affiliated with the gang. This gave them a motive to lie. As the gang expert explained, gang members do not assist law enforcement, and they hang together. In a case in which 9 of the 10 perpetrators who pled guilty or were convicted were gang members, any gang ties of the defense witnesses would clearly be highly probative to anyone assessing their credibility with regard to the relative of one of these gang members.

But my colleagues feel it was patently absurd to allow this into evidence. They point out that four of the defense witnesses were family members of the defendant and two were friends of those family members, so a bias had already been shown. What I can't understand is why the prosecution was limited to showing only one kind of bias. In a credibility contest, why wouldn't all the biases be relevant? If the prosecution shows a

2

witness is a member of the defendant's bowling team is it then barred from showing he is also the defendant's brother?

It seems to me the jury could well have believed the defendant's two non-family members were essentially unbiased if they hadn't known about the gang membership. One was a friend and one was the boyfriend of defendant's gang member stepchildren. That is a very weak bias – at least when compared to the immediate familial relationships of the witnesses who testified for the prosecution. Without evidence they associated with the gang to which the stepchildren belonged, the jury might well have accepted them as the least biased witnesses on the ground.

I think my colleagues have overlooked the critical difference between this case and the cases they rely upon for the proposition that gang evidence should not be introduced for impeachment. Those cases are all cases where the prosecution proved *the defendant* was a gang member so as to impeach the credibility of his fellow gang members. The majority cites not a single case in which a court has required exclusion of evidence witnesses who were gang members that did not involve showing the defendant was also a gang member.

That, of course, makes perfect sense. I wholeheartedly agree that if you propose to introduce evidence of the defendant's gang membership – if you propose to tell the jury the person whose guilt they are assessing is a bad person – you need a strong showing of probative value. As the cases cited by my colleagues have recognized, such evidence carries a great danger of prejudice.

But that is not our case. Here, to quote from the majority opinion, "No evidence was presented even remotely suggesting he belonged to CKA or any other gang. He did not even live in the neighborhood. He lived miles away in another county. Nor did the prosecution allege he committed the substantive crimes 'for the benefit of, at the direction of, or in association with' CKA." (Maj. opn. *ante*, p. 9.) So the gang evidence was quite clearly limited to people *other than* the defendant. Cases like *People v. Albarran* (2007) 149 Cal.App.4th 214, *People v. Maestas* (1993) 20 Cal.App.4th 1482

3

(*Maestas*), *People v. Avitia* (2005) 127 Cal.App.4th 185, and all the other cases relied upon by my colleagues, were cases that involved showing *the defendant* was a gang member. That was simply not the case here, so the prejudice that concerned those courts could not possibly have obtained here.

This gang evidence *only* showed the witnesses were gang members. It only showed *they* had a reason to fabricate in addition to the slight bias their friendship with defendant's stepchildren would establish. They – and they alone – had a motive of supporting the parent of a fellow gang member and testifying against the perennial nemesis of all gangs, law enforcement. Such evidence seems to me unquestionably relevant (*People v. Ayala* (2000) 23 Cal.4th 225, 276-277; *People v. Maestas*, *supra*, 20 Cal.App.4th at p. 1495), and, since the facts of the case shielded defendant from any suggestion he was a gang member, the prejudice that so concerned the courts in the cases relied upon by my colleagues did not exist here.

"'''The "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant *as an individual* and which *has very little effect on the issues*. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) [¶] The prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008-1009.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439.)

4

Here, the evidence could evoke no emotional bias against the defendant as an individual, and had a serious and legitimate effect on the issues.

I don't see a substantial likelihood the jury would have used this evidence for an illegitimate purpose. I think we have long since passed the point where the children's sins are visited upon the parent. The fact appellant's stepchildren belong to a gang and have friends who associate with the gang is hardly inflammatory. If we recognize that jurors are our peers, we have to recognize they are not likely to be so overcome by emotion when they find out the defendant's stepchildren are gang members that they will rush to convict him. That underestimates our fellow citizens. [2]

If, as the Supreme Court said last year in *People v. Valdez* (2012) 55 Cal.4th 82, 145, "the test for prejudice under . . . section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction[,]" I think this evidence passes that test.

---

[2]     Indeed, the jury was explicitly instructed the gang evidence was to be used solely to judge the credibility of the witnesses. And their acquittal of defendant on one count indicates they understood this limitation and were not simply stampeded by an emotional reaction to his stepchildren's gang membership. (See, e.g., *People v. Homick* (2012) 55 Cal.4th 816, 879 [curative effect of jury instructions on credibility where extraneous credibility evidence presented].)

So I am not sure the trial court committed error of any kind here.  I certainly don't think we should be finding an abuse of discretion in the call.  As another panel of this court said just a few months ago, "[S]ection 352 rulings '"will not be overturned on appeal in the absence of a clear abuse of . . . discretion, upon a showing that the trial court's decision was palpably arbitrary, capricious, or patently absurd, and resulted in injury sufficiently grave as to amount to a miscarriage of justice." [Citation.]'  (*People v. Lamb* (2006) 136 Cal.App.4th 575, 582.)"  (*People v. Nguyen* (2013) 212 Cal.App.4th 1311, 1331-1332.)  I think the *Nguyen* court was right; I think this one is wrong.


BEDSWORTH, J.

6