Filed 9/30/13  P. v. Hoag CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061967 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD234677) |
| DOMINICK HOAG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kerry Wells, Judge.  Affirmed.

David L. Annicchiarico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Dominick Hoag guilty of assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1).) The jury also found true that he inflicted great bodily injury while committing the felony and personally used a deadly weapon (a knife). (Pen. Code, §§ 12022.7, subd. (a), 1192.7, subd. (c)(8), (23).) The court imposed a five-year sentence.

On appeal, defendant contends the trial court erred in admitting evidence that he was affiliated with the Hells Angels gang. He also contends the court erred in denying his new trial motion based on his ineffective assistance claim. We reject these contentions and affirm the judgment.

FACTUAL BACKGROUND

*Overview*

During a chaotic multi-person fight at a party attended mainly by high school and college students, 19-year-old Jonathon Wilson was stabbed in the lower back. Wilson was not seriously injured, but the wound was close to his spine and kidney.

Although Wilson did not see who stabbed him and there were no eyewitnesses to the actual stabbing, several witnesses testified that Wilson and defendant were fighting shortly before the stabbing. Additionally, one witness, Mariah Oelke (who had known defendant for several years), saw defendant holding a knife immediately after his fight with Wilson and heard defendant indicate that he had stabbed someone.

At trial, the prosecution called several of the teenagers/young adults who attended the party. These witnesses included the victim (Wilson) and eyewitness Oelke. The witnesses also included two of defendant's friends, who made clear that they did not

2

believe defendant was involved in the stabbing. One of these friends, Michael Zimmerman, testified that he pulled out a knife during the fight and that he (and not defendant) was the person who stabbed Wilson. Zimmerman claimed he stabbed Wilson by accident. The defense did not independently call any witnesses, but relied on the prosecution witnesses (and particularly Zimmerman) to establish its primary defense that it was Zimmerman and not defendant who committed the stabbing. In finding defendant guilty, the jury apparently credited Oelke's testimony and found Zimmerman's testimony to be unreliable.

The appellate issues raised by the parties require that we provide a somewhat detailed description of the evidence presented at trial. Although there were various inconsistencies in the testimony of the teenage/young adult witnesses who attended the party, we summarize the facts in the light most favorable to the prosecution and highlight the inconsistencies only to the extent they are material to the resolution of this appeal.

*Summary of Prosecution Case*

On December 20, 2010, Chet Cleater hosted an animal costume party at his parents' Point Loma home. Cleater and Wilson are close friends and both had graduated from high school about six months earlier. Wilson arrived at Cleater's house at about 8:00 p.m. or 8:30 p.m. to help set up for the party. Wilson was dressed as a bunny.

The party was intended to be "invite only," and for the first hour or two, only invited individuals arrived and most were dressed in animal costumes. These guests entered through the front door. Wilson knew these individuals because they had attended

3

his former private high school or the neighborhood high school. The party featured a disc jockey, alcoholic beverages, and beer pong, a drinking game played on a ping-pong table.

At about 10:00 p.m., defendant and his three close friends (Zimmerman, Terry Chambers, and Bradley Kinsella) arrived. These individuals had not been invited and they walked into the backyard through a side gate. Unlike the other partygoers, the four were not wearing costumes. Defendant wore a hoodie sweatshirt, shorts, and a hat.

Cleater approached defendant and his friends, and asked them to leave. Cleater and his friends were not comfortable with defendant being at the party because defendant was not in their same crowd. When defendant failed to leave, Cleater and Wilson repeated the request that defendant and his friends leave the party. After a discussion, Cleater allowed defendant and his friends to stay, "as long as nothing happens," but made clear that they should "stay out of the house."

Shortly after, defendant pulled a young woman's hair (Cayla Green), and she slapped him. Green heard the word "bitch" directed at her. Green "immediately regretted the decision because of how [defendant] looked at" her. One of defendant's friends, Kinsella, intervened, telling Green to "not mess with" defendant.

Nineteen-year-old Mariah Oelke, another invited guest, witnessed the incident and heard defendant say something like " 'I would hit a bitch.' " Oelke had gone to the same school as defendant and had known him since her freshman year in high school.[1] After

---

[1] At trial, Oelke said she was Wilson's friend, but denied that she had any "bad blood" or any prior conflict with defendant.

the exchange, Oelke noted the atmosphere "got kind of weird," prompting her to move. She moved to a raised platform where she stood until she left the party.

Shortly after, one or more individuals (including Zimmerman) threw tomatoes at the disc jockey who was inside the house. Cleater turned the music off and yelled, "'[w]hoever is throwing . . . food, get out of [this] house.'" At that point, many of the partygoers went outside to the backyard.

Several fights then occurred. Defendant and one of Wilson's good friends began to hit each other. Attempting to defend his friend, Wilson "jumped in" and threw "a couple punches" towards defendant. Defendant punched back, but Wilson did not recall being hit and said that defendant's punches were "flagrant." Wilson described defendant's actions as "bear-hug-type rounded punch[es]." During the fight, several of Wilson's friends were surrounding him and attempting to assist with the fight.

Oelke was standing about six feet away and saw defendant's and Wilson's arms going around each other's bodies. They were "grabbing each other and punching," and looked like they were "wrestling." Oelke then saw both Wilson and defendant fall onto the ping-pong table, knocking it over. Defendant and Wilson wrestled on the ground for about 20 to 30 seconds.

Defendant's friend Chambers (and possibly one other person) pulled defendant out of the fight. Chambers testified that he did not see defendant holding a knife. However, Oelke, who was standing about two feet away from defendant and his friends, noticed a knife in defendant's right hand. She said the knife was a skinny, folding knife with a red handle and a three-inch blade. Most of the handle was in defendant's hand. Oelke heard

5

defendant ask his friends, "Did I get him? Did I get him?" His friends replied, "'Yeah, you got him. You got him good.'" Defendant then turned towards Oelke, and, showing her the knife, said "'See this? This is what a real man uses.'"

As defendant turned away to face his friends, Oelke discretely took two photographs of the knife with her cell phone. She gave the photographs to the police. The first photograph was entirely black. The second photograph was admitted into evidence. It depicted a shiny pointed metal object, but the photograph was mostly black and did not show who was holding the metal object (if anyone). Although the photograph appears to show a small portion of the knife handle and depicts other objects as red, there is no red color showing on the knife.

After Cleater's father told everyone to leave and that the police had been called, defendant and his friends quickly left the party. Defendant and his three friends (Kinsella, Chambers, and Zimmerman) went to a Denny's restaurant.

After the fight ended, Wilson did not initially realize he had been stabbed. He walked to his girlfriend, who noticed blood all over his back. Wilson then went to the hospital. The treating physician noted that the stab wound was three and one-half inches deep and one and one-half inches wide. The doctor opined that the knife went into Wilson's lower left back at an angle, and then curved away from the spine. The doctor said that if the knife had gone in straight, it could have hit Wilson's kidney. Wilson received stitches and staples to close the wound.

When Wilson spoke to police officers after the incident, he was unable to identify defendant as the person with whom he was fighting, but his description matched

6

defendant's appearance, including his height, tattoos, and distinctive "gauged" earrings. When police officers showed Wilson a photograph of Zimmerman, Wilson said he never fought with Zimmerman at the party and did not see Zimmerman while he was fighting with defendant. Wilson also said he was in no other fights at the party other than his fight with the person who looked like defendant.

One week after the party, police officers conducted a traffic stop and defendant was a passenger in the vehicle. Police officers searched defendant's backpack and recovered a knife in a plastic sheath that was designed to be worn around the neck or waist on a belt. The officers also found Hells Angels clothing inside the backpack and two hypodermic needles. At the same traffic stop, police recovered two more knives, one from defendant's person and one from underneath the front passenger seat where he had been sitting. None of the knives had a red handle. At trial, police officers indicated there was nothing unlawful about defendant's possession of these knives.

About six months later, the police conducted another traffic stop while defendant was on a motorcycle and seized a folding pocket knife from defendant. The knife was later lost. There was no evidence suggesting this knife was the knife used in the December 20 stabbing and there was no evidence that defendant was carrying this knife illegally.

*Testimony of Defendant's Two Friends: Zimmerman and Chambers*

At trial, the prosecutor called two of defendant's friends as witnesses: Zimmerman and Chambers. Portions of their testimony were helpful to the prosecution case and other portions were helpful to the defense case.

7

*Zimmerman*

In his trial testimony, Zimmerman said he went to Cleater's party with his three friends (defendant, Chambers, and Kinsella) and that the four arrived together in Kinsella's car.  Zimmerman acknowledged he was involved in the backyard fights, which he described as chaotic and fast-moving.[2]

Zimmerman said he initially began pulling people off defendant during defendant's fight, but then became involved in his own separate fight.  He explained that when he was attempting to help defendant, several individuals surrounded him and then the group moved so he could not see what the defendant or his other friends were doing.  After a short time, Zimmerman pulled out his knife for the first time when "some guy" kept "swinging" at him.  Zimmerman said this knife had a black handle.  Zimmerman held out the knife and warned everyone to get back and leave him alone.  At that point, a large male tackled him from behind and landed on top of Zimmerman.

When Zimmerman turned his head, this large individual began to choke him. Zimmerman then dropped the knife and never saw it again.  Zimmerman said he did not " 'know what happened to the knife' " after he was tackled.  When Zimmerman was finally able to stand up, he "just ran" away.  Zimmerman testified he did not have the knife when he left the party.

---

[2]     He said "[The fight] was just all over the place . . . .  The whole backyard is moving.  Everyone is fighting.  There was chairs being thrown.  Someone came running out of the house with a pot or a pan.  Stuff was going on very fast . . . ."

Based on this trial testimony, Zimmerman took responsibility for stabbing Wilson. Zimmerman testified that he believed he was the person who stabbed Wilson, but said the stabbing was inadvertent and that he did not "intentionally force my knife" into anyone. He said defendant had no involvement in the stabbing.

In an attempt to challenge the credibility of Zimmerman's trial court admissions, the prosecution elicited Zimmerman's testimony that when he was first interviewed by investigators he had denied he had a knife or had stabbed anyone at the party. However, on the day of the preliminary hearing, Zimmerman told investigators that he may have accidentally stabbed someone when he pulled out his knife at the party. Over defense objections (and as detailed below), Zimmerman also acknowledged that he told investigators before trial he did not want to testify because he was afraid of defendant based on defendant's association with the Hells Angels.

*Chambers*

Chambers testified he is defendant's close friend. He said he witnessed two fights at the party; defendant was involved in one fight and Zimmerman was involved in the other fight. The fights were about 15 or 20 feet apart. With respect to defendant's fight, Chambers said that "five or six guys" were "surrounding [defendant] in a circle, throwing blows." Although Chambers was standing near defendant, he did not see anyone get stabbed and never saw defendant with a knife. Chambers said that he pulled defendant out from the fight, and as he was pulling defendant he was holding defendant's arms and saw that defendant did not have a knife in his hands. He said that although defendant

9

carries knives, he did not believe defendant had a knife that evening. Chambers also said he did not hear or see defendant talking with Oelke after the fight.

### *Defense Theory*

Defense counsel's main defense theory was that Zimmerman committed the stabbing. Defense counsel relied on Zimmerman's trial testimony and on Wilson's admissions that during the fight there were several individuals behind him who he could not see. Defense counsel also vigorously argued that Oelke (who is of small stature) could not have physically seen the fight and/or did not actually see defendant holding a knife.

### *Verdict and New Trial Motion*

The jury found defendant guilty of assault with a deadly weapon and found true the allegations that in committing the offense he inflicted great bodily injury and personally used a deadly weapon (a knife).

Shortly after the verdict, defendant retained a new counsel, who then brought a new trial motion based on several grounds, including that trial counsel did not provide "constitutionally mandated effective assistance." After a hearing at which several witnesses testified, the court denied the motion.

10

## DISCUSSION

### I. *Admission of Gang Related Evidence*

Defendant contends the trial court abused its discretion by admitting evidence of his affiliation with the Hells Angels. Defendant contends the evidence was highly prejudicial and should have been excluded under Evidence Code section 352.[3]

### A. *Background Information*

Before trial, defendant requested the court to "prohibit or sanitize any references to Hell's Angels, the motorcycle club, based on the fact they would tend to be more prejudicial than probative and not relevant . . . ." Defense counsel also noted that although defendant was currently a member of the Hells Angels, he was not a member at the time of the stabbing.

The prosecutor responded by stating that she did not "intend to introduce evidence that defendant is now a formal member of the Hell's Angels as that wouldn't be relevant. . . . [¶] . . . [¶] . . . The only time it would come up is with the testimony of Mr. Zimmerman. If we believe his testimony is biased or not truthful for any reason based on the fact of the gang that defendant is currently a member . . . ." The trial court deferred its ruling, stating that the prosecutor should raise the issue if "based on the way [Zimmerman] testifie[s], there's a need to cross-examine him on that." The court noted that "the law states if a witness is influenced in their testimony either by fear or influence

---

[3] All further statutory references are to the Evidence Code.

11

of any sort, that's relevant to their credibility.  And so if indeed the witness is changing his story . . . that might come in with Mr. Zimmerman."

During his trial testimony, Zimmerman acknowledged that during an initial July 2011 interview with police investigators, he had denied any involvement in the crime and specifically denied that he had a knife at the party or that he stabbed anyone. Zimmerman said that a short time later defendant's mother drove him to a meeting with defense counsel.  On the day of the preliminary hearing, Zimmerman then changed his story, and told the investigating officer that he had a knife at the party; he pulled out the knife; and he may have inadvertently slashed or nicked someone.  At trial, Zimmerman further elaborated on this version of the events and specifically stated for the first time that he believed he stabbed Wilson.  He said he did not tell the truth earlier because he was the caregiver for his younger brother and was scared of the consequences of telling the truth.

At trial, Zimmerman also testified that he is good friends with defendant ("[l]ike family") and previously dated defendant's sister.  In response to the prosecutor's questions, Zimmerman repeatedly denied that he changed his story because he was being coerced or threatened by defendant or defendant's family and denied that he had ever said that he was fearful of defendant.  Zimmerman said he was motivated only by a desire to tell the truth and did not want defendant to go to jail for something he did not do.

Shortly after these responses, the prosecutor asked for a sidebar conference, and the court held an unreported chambers conference.  Immediately after the conference, the prosecutor asked Zimmerman:  "Isn't it true that you told us you were in fear of the

12

defendant . . . because of his association with the Hell's Angels?" Zimmerman initially denied that he had made this statement. However, he later acknowledged he may have made that statement but said he misspoke and had intended to say something different.

Later during trial, Detective Michael Stacy testified that when Zimmerman was first interviewed he denied any involvement in the stabbing, but on the day of the preliminary hearing, Zimmerman said for the first time that he pulled out a knife at the party. At that point, the prosecutor inquired whether the detective had asked Zimmerman if he feared defendant, and Detective Stacy responded "Yes, he did." The prosecutor then asked: "[D]id he tell you it was related to his association with the Hell's Angels?" Defense counsel objected based on "[p]revious rulings." After the court overruled the objection, Detective Stacy answered "Yes."

During trial, evidence was also admitted that during the first traffic stop of defendant (when he was a passenger), defendant's backpack contained Hells Angels clothing. Defense counsel did not specifically object to this evidence.

B. *Applicable Legal Principles*

All relevant evidence must be admitted unless excluded under a constitutional or statutory provision. (§ 351.) Relevant evidence includes "evidence relevant to the credibility of a witness . . . ." (§ 210.) Section 352 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§ 352; *People v. Lee* (2011) 51 Cal.4th 620, 642.)

13

A trial court has broad discretion in determining whether evidence is relevant and, if so, whether the evidence should be excluded under section 352. A trial court's exercise of discretion will not be disturbed unless the court acted in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

Gang evidence always carries a risk of prejudice and should be carefully scrutinized before it is admitted because it may have a highly inflammatory impact on the jury. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193.) But "[g]ang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative." (*Id.* at p. 192.)

Evidence of witness fear and possible threats and intimidation by gang members is relevant to explain possible witness bias during testimony. (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449-1450; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1367-1369; *People v. Harris* (1985) 175 Cal.App.3d 944, 957.) Evidence that a witness is afraid to testify or fearful of retaliation is highly relevant to the credibility of the witness and is generally admissible. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084; *People v. Burgener* (2003) 29 Cal.4th 833, 869; *People v. Gonzalez* (2006) 38 Cal.4th 932, 946; *People v. Avalos* (1984) 37 Cal.3d 216, 232; *People v. Sanchez, supra*, 58 Cal.App.4th at p. 1449.)

C. *Analysis*

Defendant acknowledges the evidence of Zimmerman's prior statements that he feared defendant because of his Hells Angels affiliation was relevant to Zimmerman's

14

credibility and potential bias. But defendant contends the court erred in refusing to exclude the evidence under section 352. We determine the court's ruling was a proper exercise of discretion.

Zimmerman was a critical witness at trial because he claimed that he—and not defendant—was solely responsible for the stabbing. Evidence that Zimmerman had previously admitted he was fearful of defendant because of defendant's Hells Angels affiliation was highly probative to the credibility and reliability of this admission. At trial, Zimmerman said he did not tell the truth earlier because he was the caregiver for his younger brother and he was now motivated to tell the truth because he did not want to see defendant—who was his good friend and "[l]ike family"—falsely accused. Based on these statements, a jury was likely to place substantial weight on his admissions. Under these circumstances, the evidence that Zimmerman was very fearful of defendant because of his gang affiliation was highly relevant to permit the jury to accurately weigh and evaluate the truth of Zimmerman's current admissions as compared to his prior denials that he had no involvement in the stabbing.

Although the evidence showing defendant's connection to the Hells Angels carried some risk that the jury would not view defendant's character in a favorable light, the references to the Hells Angels were brief, and were not substantially more inflammatory than the facts showing that the young people at the party were very afraid of defendant and immediately wanted him to leave because of a concern he would cause trouble. The evidence also showed defendant did in fact have a confrontation with a young woman

15

shortly after he arrived at the party. The strong probative value of the Hells Angels evidence was not substantially outweighed by the risk of undue prejudice.

Defendant contends the court should have sanitized the evidence by presenting the jury only with evidence that Zimmerman had previously said he was afraid of defendant or that he knew defendant associated with bad people. However, a jury is entitled to be apprised of not only the witness's fear, but also of pertinent facts that would enable it to evaluate that fear. (*People v. Mendoza, supra*, 52 Cal.4th at p. 1085; *People v. Olguin, supra*, 31 Cal.App.4th at p. 1369.) Because of the strong relevance of witness bias, courts should permit counsel "great latitude" in developing the existence of any bias. (*People v. Evans* (1952) 113 Cal.App.2d 124, 127.) A general reference to Zimmerman's fear of defendant or his knowledge of defendant's association with persons of bad character would have presented the jury with an incomplete and possibly confusing factual scenario, particularly because Zimmerman testified he was good friends with defendant and considered defendant "family."

Defendant's reliance on *People v. Memory* (2010) 182 Cal.App.4th 835 is misplaced. *Memory* reversed a criminal conviction based on the court's improper admission of Hells Angels gang evidence. (*Id.* at pp. 858-864.) However, in that case, the trial court admitted the evidence "to show defendants had a criminal disposition to fight with deadly force when confronted . . . ." (*Id.* at p. 859.) The reviewing court held that because " '[m]embership in an organization does not lead reasonably to any inference as to the conduct of a member on a given occasion,' " the evidence was not relevant and instead the evidence permitted the jury to make " '*unreasonable* inferences' " that the

16

defendant was guilty of the offense on the theory of "'guilt by association.'" (*Ibid*.) In so ruling, the court recognized the well-settled rule that evidence of gang membership may be admitted when it is relevant on a ground other than to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. (*Id.* at pp. 858-859.)

*Memory* is factually distinguishable because the trial court here admitted the Hells Angels evidence for a proper purpose (bias and impeachment), and not as criminal disposition evidence.

We also find unavailing defendant's reliance on *People v. Cardenas* (1982) 31 Cal.3d 897 and *People v. Maestas* (1993) 20 Cal.App.4th 1482. These decisions are inapposite because in each case the relevance of the evidence was questionable and the evidence was cumulative. In *Cardenas,* the prosecutor was allowed to impeach the defendant's witnesses for bias by showing they all belonged to the same gang even though their bias had already been amply established by other evidence. (*Cardenas, supra*, 31 Cal.3d at p. 904.) In *Maestas*, two codefendants were convicted of stabbing a man in a bar. (*Maestas, supra*, 20 Cal.App.4th at p. 1485.) Evidence was admitted that the defendants belonged to the same gang. (*Id.* at p. 1494.) The reviewing court found the admission of this evidence for impeachment purposes to be in error because the evidence that the men were in a gang was weak and cumulative of other evidence establishing a close personal relationship between defendants that was far more compelling than the common gang membership evidence. (*Id*. at pp. 1494-1497.)

17

Unlike *Maestas* and *Cardenas*, the evidence here was strongly probative on an issue central to the prosecution and defense cases. Additionally, the evidence was not cumulative. Although the jury was aware that Zimmerman and defendant were friends and thus that Zimmerman had a motive to testify in favor of defendant, the friendship relationship is of a wholly different nature than the fear evidence.

Defendant argues the prejudicial effect of the Hells Angels evidence was compounded because: (1) the prosecutor elicited testimony from two officers that they were part of a "gang" unit; (2) a police officer testified that Hells Angels clothing was found in defendant's backpack; and (3) the prosecutor mentioned the gang issue twice during her closing argument. This argument does not show prejudicial error.

First, defense counsel did not object to the gang unit references or the Hells Angels clothing. Thus, defendant waived his right to assert error on appeal. In any event, the references to the gang unit were brief and not significant in the context of the entire case. Because the Hells Angels evidence had already been properly admitted on a significant issue pertaining to Zimmerman's credibility, there is no reasonable likelihood these additional brief references would have impacted the outcome of the case. Further, the fact that the prosecutor mentioned the Hells Angels during her closing argument was not error. The prosecutor very briefly referred to this evidence solely in the context of discussing Zimmerman's change of testimony. This was appropriate comment on testimony that had been properly admitted.

Further, on our review of the entire record, we are satisfied the jury would not have relied on the Hells Angels evidence for an improper purpose. In examining

18

Zimmerman and the investigating officer regarding the prior statements, the prosecutor asked the questions without seeking details about the Hells Angels affiliation. During closing argument the prosecutor likewise did not highlight the Hells Angels evidence and merely noted the fact in discussing the unreliability of Zimmerman's admissions. In his closing argument, defense counsel admonished the jurors that the verdict should not be based on whether they liked or approved of defendant as a person and instead on whether the evidence proved he committed the stabbing. The jurors' written questions during trial and deliberations support that the jury was focused on the detailed evidence of the fight and not on defendant's character.

The admission of the Hells Angels evidence did not constitute prejudicial evidentiary error.

## II. *Ineffective Assistance of Counsel Claim*

### A. *Background*

Shortly after the jury returned the guilty verdict, defendant retained a new counsel, who then filed a new trial motion asserting various claims, including that trial counsel did not provide constitutionally mandated effective assistance because he failed to investigate and call exculpatory witnesses and failed to object to the evidence of the knives later found in defendant's possession.

At the hearing on the new trial motion, defendant testified on his own behalf and called four young men who did not testify at trial (Kinsella, Tyler Sickles, Ryan Lasky, and Aurelio Hernandez). Defendant also called his mother to testify concerning an

incident where she saw trial counsel intoxicated on a Sunday. Defendant did not call his trial counsel to testify. The following summarizes the testimony of the witnesses.

*Tyler Sickles*

Sickles testified that he attended the December 20 party with defendant and his friends. He said he was in the Army, and had gone to high school with several people at the party. He said he was the designated driver and drove defendant, Zimmerman, and Chambers to the party. He said that Kinsella drove separately. Sickles said that he had his eyes on defendant during the entire fight and he never saw defendant holding a knife.

Sickles did not see Zimmerman during the fighting. However, as Sickles was leaving the party, Zimmerman jumped down from the roof area over the back door. At that point, Zimmerman told Sickles that he had stabbed someone. Sickles saw a knife in Zimmerman's hand. It was a folding pocketknife with a silver blade and a metallic handle. The group (including defendant, Chambers, Kinsella, and Zimmerman) then left the house and went to a Denny's restaurant. At Denny's, Zimmerman again said he had stabbed someone. Sickles saw Zimmerman trying to clean the knife by wiping it off on the restaurant booth. Sickles and Zimmerman then walked outside the restaurant. Zimmerman told Sickles he was going to throw the knife away. Sickles replied: "Well, if you're going to throw it away, I'll take it." Sickles thereafter moved three times and in the process he lost Zimmerman's knife. The police did not contact Sickles, and he did not contact them. Three or four days after the party, Sickles returned to his military base in Washington state. He was unaware that defendant had been charged until after defendant was convicted. Defendant's father later contacted Sickles and told him about the

20

conviction. Sickles said he would have come to court and testified if trial counsel had contacted him. Sickles was completely sober at the party and remembered everything clearly. No one coerced him with regard to his testimony.

*Bradley Kinsella*

Kinsella testified that he was at the December 20 party and is defendant's friend. He said he drove himself to the party and met defendant and his friends at the party. Kinsella said he was sober the entire night and was standing close to defendant during the fight. He said he never saw defendant with a knife. But Kinsella also said he did not see Zimmerman with a knife and was uncertain where Zimmerman was during the fighting. Kinsella said he left the party by himself, but then he met his friends (including Zimmerman and defendant) at the Denny's restaurant. Kinsella did not hear Zimmerman talk about stabbing anyone, and did not see Zimmerman (or anyone else) holding a knife. Defense counsel interviewed Kinsella but Kinsella never received a subpoena or other notice to appear for trial.

*Aurelio Hernandez*

Aurelio Hernandez was acting as a security guard at the party. He was playing beer pong when the fight broke out and did not see the fight. However, when he heard "someone [getting] slammed into the table," he "ran over there to break it up . . . ." He said he never saw defendant with a knife in his hands. He also did not see Zimmerman with a knife.

Hernandez said that at the party he was intoxicated and high on marijuana, and that he did not have a clear recollection of the events. But Hernandez recalled that Oelke

21

was "[p]retty drunk or, like, almost drunk." When the court asked him to be specific as to how he knew she was drunk he said, "I just—I don't know. We were at a party. At lot of people had cups in their hands." He also said he saw Oelke "sip" from her cup. When the court asked what he saw Oelke doing, Hernandez responded "She was—most of the time . . . where everybody was dancing, and then I don't know. Everybody was partying, having fun."

Hernandez also admitted that he has a criminal history, including "vandalism," "fighting," and possession of a controlled substance (ecstasy). Hernandez testified that he knows that defendant carries knives; defendant has been involved in previous fights; and defendant gets upset easily. Defense trial counsel contacted him, and he spoke with counsel. He had previously told the police that everyone was saying that defendant was the person who stabbed the victim at the party.

*Ryan Lasky*

Lasky attended the December 20 party, but did not see the fight until the very end. Lasky never saw defendant with a knife, and he did not remember seeing Zimmerman at the party. Lasky testified that although he did not remember seeing Oelke at the party, he has seen Oelke "pretty drunk before" and that at parties "most of the time she'd be pretty drunk." He was never interviewed by police officers or defense counsel.

*Defendant*

Defendant testified that he met with his retained trial attorney, Frederick Carroll, approximately six times before trial. About one month before trial Carroll asked him about potential witnesses. Defendant gave his counsel six names, but at the new trial

22

motion hearing he remembered only identifying Kinsella, Hernandez, and Chambers. Although at one point defendant said he also provided his counsel with Sickles's name, he later indicated he was not sure if he had identified Sickles as a possible witness.

Defendant also testified that Carroll twice took him out to a bar-restaurant and they got drunk after meeting to discuss the case. Defendant said that Carroll did not discuss strategy with him, did not discuss the information in the police reports, and never provided any strategic reason for why he would not want to call defendant's other friends at trial. Counsel said only that his strategy would be to cross-examine the prosecution witnesses and to be nice to the prosecutor. Carroll said he had mailed Kinsella a subpoena for trial. Although at the new trial motion hearing defendant denied that he stabbed Wilson, he acknowledged that he told his counsel he did not want to testify at trial.

*Defendant's Mother*

Defendant's mother testified that she went to counsel's office on a Sunday at about noon to make a payment, and counsel was intoxicated. Counsel acknowledged that he had been drinking and said that a baseball game was starting soon. Counsel later sent defendant's mother a text message, in which he apologized for being drunk and said that she was the inspiration for his decision to quit drinking. When defendant's mother asked counsel about locating witnesses, he told her to "trust him" and to "stop worrying so much."

## B. *Court's Ruling*

At the completion of this evidence and argument, the court denied the new trial motion and provided a lengthy explanation of its ruling. In summary, the court found that with respect to each witness: (1) counsel did not know about, and had no reasonable basis to identify, the particular witness; or (2) there were tactical reasons for defense counsel's decision not to call the witnesses. The court also found the verdict would not have been different if the newly proffered witnesses had testified. The court additionally concluded that counsel's failure to object to the admission of the knives did not establish ineffective assistance because the evidence was relevant to the issue regarding defendant's opportunity to commit the offense and the court would not have exercised its discretion to exclude the evidence if defense counsel had raised the issue at trial.

With respect to the evidence suggesting that trial counsel had been intoxicated when meeting with defendant and his mother, the court stated:

> "It is disturbing to me, . . . to hear the testimony regarding [defense trial counsel] meeting with either the defendant or his mother after drinking alcohol and being drunk. . . . [B]ut there has been no evidence presented that there was any influence of alcohol in his actual representation or presentation at the time of trial. I obviously did observe the trial, and I saw no evidence of him being intoxicated or even close during the course of the trial.
>
> "It was the first time that [defense trial counsel] had ever appeared in front of me, and my impression at the end of the trial, quite frankly, was that he had done a good job. He did not just sit there like a lump on a log. He cross-examined all the witnesses. He impeached the victim with the preliminary hearing transcript. He was aware and listening and paying attention and doing his job, from what I could perceive. He argued the case appropriately. I wasn't quite sure what the jury was going to do. And I can't say from my

24

observations of Mr. Carroll that I noted any incompetence on his part."

## C. *Applicable Law*

Ineffective assistance of counsel is a valid ground for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) Upon appeal from the denial of a new trial motion based on a claim of ineffective assistance, we defer to the trial court's factual findings if supported by substantial evidence, and we exercise de novo review over the ultimate issue of whether defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

To establish a claim of ineffective assistance of counsel, a defendant must show: (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*); *People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* at p. 694; *Carter* at p. 1211.) A counsel's deficient performance results "in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660.) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' [Citation.]" (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

25

In examining whether a defendant met his burden on the first prong, we give great deference to counsel's reasonable tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876.) A defendant must establish that the challenged act or omission did not result from an informed tactical choice within the range of reasonable competence. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and to rebut this presumption the record must affirmatively disclose that counsel had no rational tactical purpose for his or her act or omission. (*Ibid.*; *People v. Jones* (2003) 29 Cal.4th 1229, 1254.) "[I]f the record contains no explanation for the challenged behavior, [the] court [must] reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .' . . . ." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

To establish ineffective assistance based on an alleged failure to investigate, a defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.) " '"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." ' " (*In re Thomas* (2006) 37 Cal.4th 1249, 1258.) Appellate courts must refrain from second-guessing trial counsel, since " ' "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."'"  (*Ibid*.)

D.  *Analysis*

1.  *Claimed Failure To Investigate/Call Exculpatory Witnesses*

Defendant contends the record establishes his trial counsel provided constitutionally deficient representation because counsel failed to adequately investigate potential witnesses and/or call exculpatory witnesses.  We reject this contention.  Defendant did not meet his burden to show the investigation and witness decisions were unreasonable, and/or that the claimed deficiencies were prejudicial.

First, with respect to Sickles, the trial court made a factual finding that defendant did not meet his burden to show that he provided Sickles's name to trial counsel, or that defense counsel could have independently identified Sickles as a potential witness.  The record supports this finding.  When asked whether he gave Sickles's name to counsel, defendant's response was equivocal, leading to a reasonable inference that he did not provide this name.  Additionally, there was no evidence that Sickles was interviewed by the police or that he was even at the party.  The trial witnesses, including defendant's close friends Chambers and Zimmerman, consistently stated that defendant came to (or was at) the party with only three other people (Kinsella, Zimmerman, and Chambers).  The first time there was any indication that a fifth person was part of that group was during Sickles's testimony at the new trial motion hearing.

Moreover, even if a reasonable counsel would have interviewed Sickles and called him as a witness, there is no reasonable probability the verdict would have been different.

27

The key defense theory was that Zimmerman—and not defendant—committed the stabbing. This defense depended on the jury finding Zimmerman's admission to be credible. However, Sickles's testimony would have cast substantial doubt on Zimmerman's veracity. Sickles said that Zimmerman was holding the knife as they left the party; Zimmerman brought the knife to the restaurant after the party; and Zimmerman gave the knife to Sickles. However, at trial Zimmerman repeatedly stated that he dropped the knife when he was tackled at the party and that he never again saw the knife. Additionally, Sickles testified that he did not see Zimmerman involved in any of the fights and that he first saw Zimmerman when Zimmerman jumped down from an elevated area following the fight. Further, both witnesses described the knife differently. Sickles (who claimed to have had the knife for many months) described the knife as silver and metallic; whereas Zimmerman said it was a black-handled knife. Additionally, Zimmerman testified that Kinsella drove Zimmerman, Chambers, and defendant to the party; whereas Sickles said that *he* was the driver.

Defendant's main defense theory was that Zimmerman stabbed Wilson with a knife. Consistent with this theory, Zimmerman admitted at trial that he stabbed Wilson. This was, of course, powerful defense evidence. Calling a witness such as Sickles—who would have substantially impeached Zimmerman's credibility on various issues—would have seriously undermined this defense theory. At the very least, Sickles's testimony would have created confusion and ambiguity with respect to Zimmerman's admissions. As the trial court observed "putting two witnesses on who were both friends of the

28

defendant with substantially different stories about the knife could actually have been very detrimental to the defendant in this case."

With respect to Kinsella, counsel interviewed this witness and at one point apparently intended to subpoena him, but ultimately made the decision not to call Kinsella as a trial witness. We are required to presume this was a tactical decision (*People v. Carter, supra*, 30 Cal.4th at p. 1211), and the record supports that the decision was reasonable. Although Kinsella testified that he did not see defendant with a knife during the fight, he acknowledged that he was a good friend of defendant. Additionally, Kinsella testified that he never saw Zimmerman during the fight, which would have undermined the defense theory that Zimmerman was physically close to Wilson and defendant when they were fighting. A reasonable defense counsel could decide that Kinsella would merely add more confusion and ambiguity to the defense case and that the best way to present the defense would be to keep it simple and focused primarily on Zimmerman's admission.

With respect to Lasky, defendant argues his counsel was ineffective because Lasky could have impeached Oelke's eyewitness observations based on Lasky's statement that he has seen her "pretty drunk before" and that at parties "most of the time she'd be pretty drunk." However, there was no evidence that counsel knew or reasonably should have known about this potential witness. Lasky had never been interviewed by police officers, and there was no evidence that defendant identified him as a possible defense witness. Further, even if a reasonable counsel would have located and interviewed Lasky, Lasky did not remember whether Oelke was at the party, and thus his testimony

29

regarding her level of intoxication was speculative and—as the trial court stated in denying the new trial motion—would have been excluded at trial.

With respect to Hernandez, Hernandez was interviewed by police officers and trial counsel. However, the trial court found that based on Hernandez's testimony there were "some real obvious tactical reasons for not" calling Hernandez to testify. We agree. Although he was acting as a security guard, Hernandez acknowledged he remembered very little from the party and that he was intoxicated and high on marijuana, causing him to be "faded." Further, his testimony would have been concerning from a defense point of view in that he said defendant and his friends started the fight; defendant easily gets upset in situations; and he had disclosed to police officers that everyone was saying defendant committed the stabbing. Although these statements may not have been admitted at trial, it would be reasonable for a defense counsel to be concerned about the risks of calling such a witness. Additionally, Hernandez's statement that he believed Oelke was intoxicated at the party was based only on his observation that he saw her "sip" from a red cup at the party. This conduct does not support a reasonable inference that Oelke was so intoxicated that her observations were inaccurate. Finally, Hernandez did not have any helpful information regarding the defense's central theory that Zimmerman was the stabber.

Viewing the record as a whole, trial counsel's decision not to call the witnesses identified by defendant in his new trial motion and/or his failure to contact certain of these witnesses did not show his trial counsel provided constitutionally defective legal representation.

30

2. *Failure To Object to Evidence that Defendant Possessed Knives During Traffic Stops*

Defendant also contends his counsel's representation was constitutionally deficient because his counsel failed to object to evidence that he possessed several knives one week and several months after the crime. The contention is without merit. The evidence was relevant, and even if trial counsel had objected, the evidence would have been properly admitted.

*a. Factual Background*

During defense counsel's examination at trial, Chambers testified he did not see defendant with a knife at the party and did not "believe he had one." The prosecutor later referred to this testimony and then asked Chambers whether he had *ever* seen defendant carrying knives. Defense counsel objected on the basis of relevance. After a chambers conference, the court overruled the objection. Chambers then testified that he has seen defendant carry a knife, but stated that defendant does not conceal his knife and generally wears the knife outside his clothing on his hip. Zimmerman likewise testified he was aware that defendant carries a knife, but he did not believe defendant had a knife at the December 20 party.

On appeal, defendant does not challenge the court's evidentiary ruling regarding the knife testimony by Chambers and Zimmerman. However, defendant challenges his counsel's failure to object to the police officers' testimony and the physical evidence of the knives found in his possession after the December 20 party. In this regard, the prosecution presented evidence (without objection) that one week after the stabbing, police officers searched defendant's backpack in connection with a traffic stop and

31

recovered a 10-inch knife with a plastic sheath attached to a chain that could be worn around the neck or waist. During the same traffic stop, police officers found a black folding knife (black handle with a black three-inch blade) on defendant's person. This knife was not concealed; it was clipped on the outside of defendant's pocket. Officers also found a knife with a three-inch black blade and black handle in the pocket of a vest folded underneath the front passenger seat where defendant had been sitting.

During a second traffic stop about six months later, police officers found defendant in possession of a "fold-out" knife. The testifying officers did not remember the color of the knife. This knife was inadvertently lost by police officers when they failed to secure it at the scene.

There was no evidence presented that defendant's possession of these knives was unlawful. The evidence showed that defendant was not concealing the knife that he had on his front pocket and the testifying police officers indicated that defendant's possession of the knives did not appear to reflect criminal conduct.

In his new trial motion, defendant argued his counsel provided ineffective assistance in failing to object to the admission of the four knives found during the traffic stops. He argued that the only reason this evidence was introduced "was to smear [his] character." In rejecting this argument, the trial court stated that even if defense counsel had moved to exclude evidence that defendant possessed the knives during the traffic stops, the court would have admitted the evidence as the evidence was relevant to defendant's opportunity to commit the stabbing.

*b. Analysis*

Generally, evidence of a defendant's possession of a weapon is not admissible to show defendant's bad character or disposition to commit the crime. (*People v. Riser* (1956) 47 Cal.2d 566, 577, overruled on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 and *People v. Morse* (1964) 60 Cal.2d 631, 648-649 & 638, fn. 2.) Thus, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession [because] such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; see *People v. Riser, supra*, 47 Cal.2d at p. 577; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393; *People v. Henderson* (1976) 58 Cal.App.3d 349, 360.)

However, evidence of a weapon not used in the crime is admissible if the evidence is probative on an issue other than the defendant's character or disposition to commit the crime. (See *People v. Smith* (2003) 30 Cal.4th 581, 613-614; *People v. Cox* (2003) 30 Cal.4th 916, 956.) The central inquiry is whether the weapons evidence bears some relevance to the weapons actually used or another relevant issue, or is being admitted simply disguised as character evidence. (See *People v. Smith, supra*, 30 Cal.4th at pp. 613-614; *People v. Barnwell, supra*, 41 Cal.4th at pp. 1056–1057; *People v. Prince* (2007) 40 Cal.4th 1179, 1248-1249.)

In this case, the knives were relevant for a purpose other than showing defendant's criminal character. The defense elicited testimony from defendant's friends that defendant did not have a knife at the party and thus that he could not have committed the

33

crime. The victim likewise denied seeing defendant holding a knife. The fact that defendant regularly carried knives was relevant to counter this evidence and to strengthen Oelke's testimony that she saw defendant holding a knife. The fact that defendant was twice found with knives in his possession during traffic stops leads to an inference that he regularly carried knives which logically supports an inference that defendant had a knife on the evening of the stabbing and thus that it was he who stabbed Wilson. This chain of reasoning does not constitute prohibited character evidence.

Defendant argues that "even if evidence that [defendant] regularly carried knives had some limited relevance," it was below the standard of care for counsel to fail to seek exclusion of the evidence under section 352. However, as the trial court stated in denying the new trial motion, it would not have excluded the evidence because of the strong probative value to show that defendant brought a knife to the party. The court's decision would not have been an abuse of discretion.

Further, on the record before us, we cannot conclude that there can be no reasonable tactical explanation for counsel's failure to object to the knife evidence. First, counsel was aware that the court had already overruled his objection to Chambers's testimony that defendant frequently carries a knife on his hip and that defendant does so without concealing the knife. Thus, defense counsel could have made a reasonable tactical decision that allowing these knives to be shown to the jury would strengthen the defense case that defendant does not conceal his knives and thus the fact that no one (except Oelke) saw defendant with the weapon at the party supports that defendant did not actually have a knife at the party.

34

Equally significant, defense counsel could have also reasonably concluded that the four weapons found in defendant's possession weakened the prosecution's case because the eyewitness (Oelke) testified that she was certain the knife she saw defendant holding had a metallic red handle. None of the knives found in defendant's possession matched Oelke's description. Thus, while the knives supported the prosecution's theory that defendant's practice of regularly carrying knives made it more likely he was carrying one at the party, it also strengthened defense arguments that there was no physical evidence to support defendant's involvement in the crime and thus the prosecution had not proved its case beyond a reasonable doubt. Defense counsel's strategy was not to deny that defendant had ever owned or carried a knife. This would have been unpersuasive given testimony (unchallenged on appeal) that defendant did regularly carry knives. Instead, defense counsel argued that while defendant did carry knives, the prosecution could not link any of the knives to the charged crime. This could call into question the eyewitness testimony, and support the defense theme that the prosecution's evidence was nothing more than a "a dog and pony show" and that defendant was being unfairly targeted by the police for a crime that was committed by Zimmerman.

3. *Failure To Object to Evidence that Defendant Possessed Hypodermic Needles*

Defendant additionally contends counsel was deficient for failing to object to evidence he possessed two hypodermic needles.

During direct examination, a police officer testified that during the first traffic stop, he found in defendant's backpack two hypodermic needles and a vial with a clear substance. Defense counsel did not object to this evidence.

35

Although the needle/vial evidence does not appear to be directly relevant to any issue in dispute, counsel's failure to object did not constitute ineffective assistance of counsel. The "decision to object or not object to the admission of evidence is inherently tactical, and a failure to object will seldom establish ineffective assistance." (*People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.) Counsel could have made the decision not to object to avoid highlighting the testimony as an objection could have drawn more attention to the needles. By not objecting, the officer was permitted to continue his testimony, the reference to the hypodermic needles was minimized, and neither counsel nor any witness again referred to the evidence.

Moreover, defendant fails to show prejudice. Because there was no evidence that the needles were associated with any criminal conduct, it is not reasonably likely the jury would have used this evidence to improperly assume defendant was a bad person or had a bad character or had a disposition to commit crimes. The reference to the hypodermic needles was mentioned once in passing and never mentioned again. There is no reasonable probability that if defense counsel had successfully objected to the evidence of the needles and vial found in defendant's backpack, that a determination more favorable to defendant would have resulted. (*People v. Holt* (1997) 15 Cal.4th 619, 703.)

DISPOSITION

Judgment affirmed.

HALLER, Acting P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.