Filed 12/16/20  P. v. Bentley CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058443 |
| v. | (Super. Ct. No. 16CF3204) |
| SHANDEL LENN BENTLEY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Shandel Lenn Bentley was convicted of pimping and pandering. The trial court admitted into evidence lyrics defendant wrote that described the pimping and pandering subculture and confirmed in many respects the testimony of one of the women whom defendant was accused of pimping. On appeal, defendant contends the court prejudicially erred in admitting the lyrics into evidence. We conclude the trial court correctly found that the probative value of the evidence outweighed any prejudicial effect. Even if the trial court had erred in admitting the lyrics, given the strength of the other evidence against defendant, the error would have been harmless. Therefore, we affirm.

STATEMENT OF FACTS

I.

*THE SURVEILLANCE AND INVESTIGATION*

On December 20, 2016, the Costa Mesa Police Department Special Investigations Unit conducted a surveillance at the La Quinta Inn. Detective Arnold Alegado, Detective Joseph Saar, Detective Sergeant Brent McKinley, Detective Jeremy Hermes, and Detective Santibanez were all in various locations around the motel. Saar obtained the room register from the front desk clerk; room 150 was registered to Melissa O., and room 151 was registered to defendant. Saar observed, parked outside of room 151, a black Lexus with dealer plates registered to defendant.

Saar and McKinley observed two women, later identified as Melissa O.[1] and Jane Doe,[2] exit room 151. Melissa and Jane Doe walked to the "track," an area nearby where significant prostitution activity occurs; the detectives continued surveilling

---

[1] Melissa was also referred to at trial as Barbie; we will refer to her in this opinion as Melissa to avoid confusion.

[2] The parties agreed to refer to this victim only as Jane Doe, and her name was redacted from the record.

them. At the same time, Detective Hermes located ads placed by Melissa and Jane Doe on Backpage.com, which was a website on which sex workers posted advertisements. Hermes texted both numbers; Jane Doe responded and asked him to call her. Hermes spoke to Jane Doe and arranged a meeting with her and Melissa for purposes of prostitution activity. Hermes called back several times over the course of a half hour to ask whether Jane Doe had found a room in which to meet. She eventually told Hermes to go to the Ana Mesa Motel.

While Hermes was communicating with Jane Doe, McKinley and Saar observed Jane Doe speaking on her cell phone, getting into a van with Melissa, and being dropped off at the Ana Mesa Motel. At the motel, Melissa and Jane Doe stopped in the motel's lobby, and then proceeded to room 212. When Hermes arrived at room 212, he said "let's get down to it" and gave Jane Doe the agreed-upon amount of money. Jane Doe put the money in her purse. Hermes then opened the motel room door and admitted the other officers.

At about 9:00 p.m. that same evening, defendant exited room 151 at the La Quinta Inn and got into his Lexus. Detective Santibanez conducted a traffic stop, and Detective Alegado responded to the location. Defendant had the number "100" tattooed on his arm. A search of defendant and his car revealed a cell phone, $43 in cash, a bank debit card issued to Melissa, and a letter addressed to Melissa. A search of room 151 turned up women's clothing, laptop computers, a white Samsung smart phone, refillable gift cards and a red composition-style notebook. After having been read his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, defendant admitted he had written the rap lyrics in the composition book.

While talking to Jane Doe, Detective Saar learned that Alegado and Santibanez had detained defendant. Jane Doe gave Saar permission to use her phone to call the phone number defendant had given to the desk clerk when he checked in at the La Quinta Inn; this number was stored in Jane Doe's cell phone, and she had made

3

numerous calls to it. When Saar called that number, defendant's cell phone rang, and its screen display showed an incoming call from "Aspen"; Jane Doe's working name was Aspen.

Later, Detective Alegado obtained Melissa's consent to search her cell phones and a laptop found in room 151. Alegado was able to access defendant's e-mail through the laptop. He found numerous e-mails regarding motel reservations in different states, most of which were for a single night's stay. The laptop also contained photographs of Melissa, some of which were also posted in advertisements on Backpage.com. Melissa's cell phone showed about 30 incoming calls, 55 outgoing calls, and three missed calls from defendant's cell phone number, all from December 19, 2016.

## II.

### *JANE DOE'S TESTIMONY*

Jane Doe testified at trial. She was 27 at the time of trial and had started working in the sex industry when she was 15. In December 2016 she came to Orange County and started working in Santa Ana in the area known as the track. At the time she was a "renegade," meaning she did not have a pimp.

Jane Doe was aware that a pimp usually holds all of a prostitute's identification. The prostitute is required to check in to let the pimp know she is alright and, at the end of each date, to report how much money she earned. Hiding money from a pimp (known as "tucking") will get you in trouble. A prostitute who gets in trouble with her pimp may be hit, have her food or privileges taken away, or be kicked out or fired without getting back her identification and other personal items.

After arriving in Orange County, Jane Doe met Melissa. Jane Doe enjoyed Melissa's company, believed she was well taken care of, and wanted to work for Melissa's pimp. Melissa's number was saved in Jane Doe's phone with an emoji of a

4

dollar sign on her tongue and two girls dancing. Jane Doe referred to Melissa as "wifey."[3]

Jane Doe stayed with Melissa in room 150 of the La Quinta Inn, and worked out of that room for two days. Defendant was staying in room 151; Jane Doe left her suitcase and a smaller bag in that room. Melissa called defendant "King," which caused Jane Doe to believe he was Melissa's pimp. There is a hierarchy among a pimp's prostitutes; a newer "girl" (which refers to the prostitutes a pimp controls) is on a type of probation until she earns the pimp's trust, after which she will be treated better. The girl who has been around the longest and is most trusted is referred to as the "bottom bitch"; Melissa was defendant's bottom bitch.

Defendant told Jane Doe that texting was not a good way to communicate because it is easy to trace; he wanted her to check in by phone every 45 minutes.

Using their cell phones, Jane Doe and Melissa placed ads for prostitution both separately and together. After two days of working in the room and on car dates, Jane Doe left all of the money she had made—about $300—on a dresser in room 151 as a partial payment on her "choosing up fee" or "choosing fee."[4] The money was intended for defendant, although she did not see him in the room at the time.

On December 20, 2016, Jane Doe got in a physical altercation with another prostitute on the track. In room 151, defendant was "a little agitated" that Jane Doe had gotten into a fight, but he was more upset with her and Melissa for not going back out to the track. Defendant said he was not interested in working with lazy bitches. Jane Doe and Melissa then got dressed and went back out on the track.

---

[3] "Wifey" is a term girls who work together use to refer to each other. A pimp would not use the term wifey but would refer to his girls by their working name or as "bitch" or "ho."

[4] A "choose up fee" is the fee a prostitute is required to pay the pimp in order to join his team. The amount is set by the pimp and can be paid over time from her earnings.

Jane Doe received a call for a two-girl date from one of her Backpage.com ads. Melissa called a guy named Rod who picked them up, took them to the Ana Mesa Motel, and loaned them $100 to rent a room. Jane Doe and Melissa met the date in room 212. When the date arrived he said "let's get down to it" and set the money down. Jane Doe took the money and put it in her purse. Then the date opened the motel room door and "all the police came in."

Jane Doe talked briefly to the police officers about the Backpage.com ads. The officers told her that she and Melissa were not under arrest and would not be arrested if they cooperated. She was given immunity for her testimony at trial.

### III.

### *EXPERT WITNESS TESTIMONY*

Investigator Happy Medina, a member of the Orange County Human Trafficking Task Force, testified for the prosecution as an expert witness in human trafficking, pimping, pandering, and prostitution. Medina testified that the pimp is the "king," is commonly called "daddy," and has complete control over his girls. The pimp sets a monetary quota for his girls for the night and they cannot go home until they meet it. Girls usually meet with their pimp after every two or three dates to give him the money they have earned and to pick up condoms. The pimp usually remains nearby, and arrangements to meet are made by phone or text. In his absence, the bottom bitch will collect the money from his girls. The money is often laundered through gift cards.

A pimp usually provides the girls with a cellphone for work; personal cellphones are often held by the pimp as a form of control. Many pimps instruct their girls to delete text messages.

The number 100 represents loyalty, and is a popular mark for tattoos, emojis, and Instagram posts in the sex trade culture.

Pimps and prostitutes generally follow a circuit from Northern California to Los Angeles, then to Orange County and San Diego, and sometimes on to San

Bernardino or Las Vegas. The pimp decides whether the prostitute will work on the street or arrange dates via the internet. A pimp pays for the prostitute's food and other necessities, and all the prostitute's earnings go to the pimp. The pimp makes nearly all decisions for the prostitute including, sometimes, hairstyle and nail polish color. It is not uncommon for the pimp to keep his girls' credit cards, phone, personal belongings, and identification as a form of control.

A girl who is not obeying her pimp and not doing what she is supposed to do, is not generating enough income, or is not posting enough on the internet, is referred to as "out of pocket' and will be punished. The punishment can range from physical violence to humiliation or loss of privileges. "In pocket" means the girl is behaving and obeying the rules. On an "incall," where the prostitute meets the date in a motel room, a pimp may wait in his car nearby. "Flossing" refers to a pimp showing himself off as successful by, for example, driving a nice car.

Very few girls on the street are renegades. If they are stopped by the police, however, the girls will say they are renegades to protect their pimps.

Based on a hypothetical set of facts drawn from the evidence in this case, Medina opined that both Melissa and Jane Doe were each in a pimp/prostitute relationship with defendant.

IV.

*DEFENSE EVIDENCE*

Defendant did not testify at trial. He presented evidence from Armand King, the director of a nonprofit organization that works with at-risk youth, the formerly incarcerated, survivors of human sex trafficking, and the high-risk population. King spent about 10 years involved in the pimping and prostitution lifestyle and now works to help people get out of it. He trains law enforcement and hotel industry personnel about identifying and dealing with pimping and pandering. King disagreed with much of

7

Medina's testimony,[5] and suggested that there is a "trust relationship between the pimp and the prostitute." Armand testified that the lyrics written by defendant are reflective of black hip hop culture, not of pimping.

V.

*PROCEDURAL HISTORY*

Defendant was charged in an information with two counts of pimping (Pen. Code, § 266h, subd. (a)), and two counts of pandering (*id.*, § 266i, subd. (a)). The jury found defendant guilty on all counts.

The trial court sentenced defendant to a determinate term of five years four months in prison. Defendant timely filed a notice of appeal.

---

[5]  King talks with people on a regular basis to stay current with what is going on in the prostitution world, especially in Southern California, but he has not physically been to the Orange County track for at least 15 years. King agreed that a renegade is a prostitute working without a pimp. There are more renegades on the track now in Orange County than people who are associated with a pimp. Real pimps are "rare" these days. Prostitutes are being approached by law enforcement and persuaded to accuse men of being their pimp in order to get out of trouble themselves. A pimp wants to recruit girls into prostitution, and makes his prostitutes look nice as a recruiting tool. It is a myth that pimps are referred to by their girls as "King," and a crown is not a symbol of a pimp. Gift cards are not commonly used to hide money. Prostitutes do not regularly check in with their pimp unless they are very new to the trade. Checking in frequently will not tell the pimp whether or not the girl is tucking. Only an inexperienced pimp would sit in his car in the parking lot while the prostitute has sex in a motel room. Tracks are not used very much; most sex purchases occur through the Internet. A pimp will rarely allow one prostitute to collect money from another prostitute. A choose up fee is paid up front to establish the pimp/prostitute relationship; it would never be paid in installments.

8

DISCUSSION

I.

*ISSUE PRESENTED AND STANDARD OF REVIEW*

Defendant objected to the admission of the lyrics contained in the composition book found in room 151 as irrelevant.[6]  The prosecution argued the lyrics demonstrated defendant's "familiarity with the language in terms involved in prostitution."  The court overruled defendant's objection, finding that the lyrics "had probative value for the reasons stated by the People, and I did not believe that that probative value was substantially outweighed by any unfair, undue prejudice."

"'On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible.'" (*People v. Duong* (2020) 10 Cal.5th 36, 64-65.)

II.

*THE CHALLENGED LYRICS.*

At trial, portions of the lyrics to defendant's rap song were read to the jury, and a copy of his actual writings was admitted into evidence.  Medina provided expert opinion testimony as to the meaning of the lyrics.  In the following paragraphs, we will set forth the lyrics with Medina's interpretations in footnotes.

"Learned to stack[7] my cake up in case they raid mayne.  These N-word talking murder but they ain't with the mayne.  Leave the berner at the scene.[8]  Wiped clean.[9]  We made men, cross country with this pimpin.[10]  Knock your dome 4 da

---

[6]  The parties' arguments were not recorded; the trial court later summarized the arguments on the record outside the jury's presence.

[7]  "Stack" refers to income.

[8]  Leaving a burner or prepaid cell phone at the scene.

[9]  Deleted.

[10]  Indicating the transitory nature of prostitution.

9

change mayne.[11]  [¶] . . . [¶] They funkin over.  They funkin over bitches.  These suckas is so lame.  They hating on the gangsta.  I know it's a cold game.[12]  From rags 2 riches.  [¶] . . . [¶] Playa pimping.  From counting them crumbs 2 really stacking my riches.  I'm on my way 2 da top.[13]  I'm still from da mob.  Catch me city 2 city, state 2 state, wit a blonde.[14]  Conversation rule the nation.  Yeah, the game don't stop.[15]  If she mobbing my way, than the bitch be knocked.  Only pop it 4 a fee.[16]  They say crime don't pay, but if she got her choosing fee then I'll be on [my] way."

"I'm the type of pimp 2 knock ya bitch and hit the highway and keep her 10 toes down from Friday 2 Friday.  Hit 5 north and sit down on Pac Highway."[17]

"Boyfriend pimping.  [¶] . . . [¶] Never with the matrimony.  She used to [¶] . . . [¶] suckas who really been asking 4 it.  Fascinated with the game.  Not scared to hit the blade.  She's just stuck in her ways."[18]

---

[11]  Referring to money; knocking is part of the recruitment of a prostitute by a pimp.

[12]  "Cold game" refers to prostitution.

[13]  Indicating he started off low as a pimp, but is now really earning money and is on his way to the top.

[14]  Traveling from state to state with a white prostitute.

[15]  He is going to continue in this business.

[16]  Although it could have other meanings, Medina testified this could refer to the choose up fee.

[17]  He is identifying himself as a pimp, and as the type of pimp who will try to recruit another pimp's prostitute to work for him.  The references to the "5 north" and "Pac Highway" refer to the circuit between Northern and Southern California.

[18]  This refers to "boyfriend pimping," never with a long-term commitment.  The "game" refers to the prostitution lifestyle and the pimping and pandering subculture.  The "blade" is synonymous with the track, and means the physical location where the girls go out to work.

"I'm from the era of track stars and them million dollar boulevards[19] where hooka's stack it up jumpin in and outta strangers cars.[20] Chasing thousand dolla quotas. Might catch her stomp down on da corna.[21] They pulling ova. Yeah, the game is still real. She be 10 toes down. Walk the taps off her heels. If he got it she gone get it. She be all about her money and been laced by some pimping. She got the nerve 4 da curb."[22]

## III.

### *THE TRIAL COURT DID NOT ERR BY ADMITTING THE RAP LYRICS INTO EVIDENCE.*

Rap music lyrics are admissible as evidence in criminal cases when they are directly related to the crimes charged. In *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1372, overruled on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, the defendant's rap lyrics were found in his home three weeks after the murder of a rival gang member. Even though the lyrics contained "general threats of violence" and references to the defendant's gang membership, the appellate court held that their probative value outweighed any prejudice: "Regardless of whether these lyrics were written before or after the killing, they . . . demonstrated his membership in Southside, his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing." (*People v. Olguin, supra*, at p. 1373.) The defendant argued admission of the lyrics violated Evidence Code section 352. In response, the court stated: "This was a crime alleged to be gang related. Gang membership was obviously important, and evidence tending to show it was highly relevant. [Citations.] The mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not

---

[19] This is part of flossing. This pimp may have been around for a while, and may be older or "old school."

[20] Referring to prostitution activity with sex purchasers.

[21] To "stomp down" is to be a hard worker.

[22] These are all references to the pimping and pandering subculture.

be said 'substantially' to outweigh their considerable probative value.  It looks to us like the trial court got it right; certainly it has not been shown there was any abuse of discretion." (*People v. Olguin, supra*, at p. 1373.)

In *People v. Zepeda* (2008) 167 Cal.App.4th 25, 28, the defendant was convicted of murder and attempted murder with criminal street gang sentencing enhancements.  At trial, the prosecutor had played for the jury two tracks from a "'gangster rap'" CD written by the defendant.  (*Id.* at p. 32.)  The appellate court held that the trial court did not err by admitting the tracks over the defendant's relevance objection:  "The evidence was probative of defendant's state of mind and criminal intent, as well as his membership in a criminal gang and his loyalty to it.  The songs showed that defendant's gang had the motive and intent to kill Sureños [the gang of which the murder victim had been a member].  This evidence, although anticipatory, was explicitly relevant to the charges against defendant.  [Citation.]  [¶] While lyrics and poems do not often establish their author's true state of mind [citation], the gang expert here testified that gangs communicate through music.  Defendant's communications here were not ambiguous or equivocal.  These lyrics, coupled with the other evidence of defendant's gang membership and his animosity towards Sureños, go beyond mere fiction to disclosing defendant's state of mind, his motives and intentions, and his fealty to furthering his criminal gang's activities.  [¶] The evidence was not unduly prejudicial.  Only two of the six tracks credited to defendant were played to the jury.  The tracks provided noncumulative evidence of defendant's state of mind and his gang association, differing in context from his tattoos, drawings, notebooks, and pictures of himself flashing gang signs.  The language and substance of the lyrics, although graphic, did not rise to the level of evoking an emotional bias against defendant as an individual apart from what the facts proved." (*Id.* at p. 35.)

In *People v. Johnson* (2019) 32 Cal.App.5th 26, 60, the trial court admitted in evidence, as evidence of the defendant's motive to kill the victim (Canady), a rap song

recorded by the victim. The appellate court rejected the defendant's contention that the song was more prejudicial than probative: "The lyrics were relevant to the prosecution's theory of the case, particularly defendants' motive to seek revenge for Canady's theft and relationship with Martin.[23] The lyrics tended to show that Canady was engaged in conduct that could provoke retaliation by Grant. Specifically, Canady's lyrics included statements about making money by selling drugs stolen from a girl who could not be trusted and that the theft was from 'rude boys' and 'Jack boys,' slang parlance for Jamaicans.[24] A trial court has wide latitude to admit evidence relevant to motive [citation] and Canady's lyrics did not fall outside this broad discretion." (*Id.* at p. 62.)

In *People v. Coneal* (2019) 41 Cal.App.5th 951, the appellate court held that the trial court erred by admitting into evidence five rap videos featuring the defendant or members of the defendant's gang: "[T]he rap videos had minimal probative value, either because they were cumulative of other, less prejudicial evidence, or because their probative value depended on construing the lyrics as literal statements of fact or intent without a persuasive basis to do so. This minimal probative value was substantially outweighed by the highly prejudicial nature of the violent, inflammatory lyrics, and the admission of these videos was therefore an abuse of discretion under Evidence Code section 352." (*Id.* at pp. 953-954.) The court explained the circumstances under which rap lyrics might be admissible: "We do not mean to suggest that lyrics are never probative of their literal truth. For example, where lyrics are written within a reasonable period of time before or after the charged crime and bear a sufficient level of similarity to the charged crime, their probative value as a statement of fact is increased." (*Id.* at p. 969, fn. omitted.)

---

[23] Martin was the girlfriend of Grant, who allegedly commissioned Canady's murder.

[24] The defendant was Jamaican.

13

The defendant did not challenge on appeal the admission into evidence of a rap video in which he appeared, which had been posted to You Tube after the murder. The song in the video included the lyrics, "'I don't know who baked the last cake./All I know was the place got yellow taped.'" (*People v. Coneal, supra,* 41 Cal.App.5th at pp. 957, 963.) The defendant also did not challenge on appeal the admission into evidence of a recording of him reciting those rap lyrics during a jailhouse call: "The lyrics referred to catching someone 'slippin for the mob he got sprayed up . . . /And I got so close in, like I was going for a lay up'; 'Two shooters on one hit that's how I like to move'; 'nine tore his chest out . . . had that boy stretched out. Got his partners mad and left his fams stressed out'; 'Caught him in the driveway, and chased him up to the porch.'" (*Id.* at pp. 957, 963.)

The appellate court held that five other videos featuring members of the defendant's gang were cumulative of other evidence of the defendant's gang membership (*People v. Coneal, supra,* 41 Cal.App.5th at pp. 966-968), and were not probative because it was unclear whether they were raps about real-life events or "made up or inflated events " (*id.* at p. 968). The videos were also prejudicial because they "casually describe graphic, widespread violence" and "contain misogynistic lyrics," which were unrelated to the specific crime charged. (*Id.* at p. 970.) However, the court concluded that there was no reasonable probability that the defendant would have received a more favorable outcome if the rap videos had not been admitted because "[t]he evidence incriminating [the defendant] was strong." (*Id.* at p. 972.)

The trial court in the present case did not err in admitting into evidence at trial the rap lyrics in the composition book. The lyrics were directly related to the pimping and pandering charges against defendant. The lyrics, which were admittedly written by defendant, showed his knowledge of the pimp subculture. The many connections between Jane Doe's testimony and the lyrics bolstered her testimony, which the defense sought to impugn. The lyrics were consistent with Jane Doe's testimony

14

regarding the payment of a choosing fee, working the track to reach a quota, and defendant's insistence that their communications be limited.

Defendant, claiming that his familiarity with the language of prostitution was not an issue, argues that the lyrics were more prejudicial than probative. What was at issue was whether defendant was a pimp and a panderer of Melissa and Jane Doe, and the lyrics confirmed that defendant was aware of the business of pimping and pandering. Although the lyrics did not refer to Melissa or Jane Doe by name, they did refer to riding the circuit with a "blonde." The other evidence showed defendant and Melissa (a white woman) had been traveling together at times when Melissa was posting suggestive photographs and soliciting sex purchasers.

Defendant also argues that the admission of the lyrics prejudiced the jury against him by causing it to believe he "is an incorrigible pimp, who openly boasts of the crimes he has committed and will continue to commit in the future." We find nothing more prejudicial about the lyrics than the testimony of Jane Doe and Medina.

Citing *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1495 and *People v. Avitia* (2005) 127 Cal.App.4th 185, 193-194, defendant also argues that the lyrics were cumulative of other evidence. The key question at trial was whether defendant was a pimp and a panderer. The lyrics written by defendant in which he portrays himself in the role of a pimp and panderer were consistent with, but not cumulative of, Jane Doe's testimony regarding the few days during which she interacted with defendant.

Finally, defendant cites *State v. Skinner* (2014) 218 N.J. 496, 499, in which the New Jersey Supreme Court upheld the intermediate appellate court's reversal of an attempted murder conviction because the trial court had admitted rap lyrics written by the defendant that were violent, profane, and disturbing, yet had little or no probative value as to any alleged motive or intent. In contrast to that case, here the rap lyrics were not read "at great length" (*ibid.*), and were factually connected to the crimes charged.

15

IV.

*ANY ERROR WAS HARMLESS*

Moreover, even assuming the trial court erred by admitting the rap lyrics, defendant has failed to show a reasonable probability that he would have obtained a more favorable outcome absent the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)[25]

Jane Doe testified extensively about how she and Melissa were prostitutes and how defendant became her pimp.  Her testimony alone would have been sufficient to establish defendant's guilt on all charges.  In addition, the People offered evidence of cell phone records, motel room receipts, the connection between the dates those motel rooms were used and when and from where Melissa posted advertisements seeking sex purchasers, defendant's movements in and near the motel rooms at the La Quinta Inn, and defendant's possession of Melissa's personal items.

DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


GOETHALS, J.

---

[25]  Defendant, citing *Chapman v. California* (1967) 386 U.S. 18, 24, argues that the correct standard is whether the error was harmless beyond a reasonable doubt.  "'Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.'"  (*People v. Watson* (2008) 43 Cal.4th 652, 686.)

16